UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

Janessa Novak, individually and as
Special Administrator for the Estate of
Lance Novak, deceased, and on behalf of
M.N. and H.N., minor children of the
deceased,

        Plaintiff,

   v.

Michael McIlvain, in his individual capacity,
Heather White, in her individual capacity,
Joshua DeLong, in his individual capacity,
Todd Leonard, M.D., in his individual capacity,
Jane Does 1-3, in their individual capacities,
Douglas County, and MEnD Correctional Care,
PLLC.

        Defendants,

Case No. 21-cv-81-jdp

**FIRST AMENDED
COMPLAINT
AND JURY DEMAND**

---

For her Complaint, Plaintiff Janessa Novak hereby states and alleges as follows:

1.     This is an action for money damages for the wrongful death of Lance

Novak ("Lance"), as the direct and proximate result of these deliberate indifference to his

serious medical needs and other wrongful conduct of the Defendants, as set forth herein.

## The Parties

2.     Janessa Novak ("Janessa") is Lance's widow.  She was appointed Special

Administrator under a January 8, 2021 Order entered by Douglas County Judge Kelly J.

Thimm, which is attached to the original Complaint as Exhibit A.  (Doc. 1, Ex. A.)  In

addition to her role as Special Administrator for Lance's estate, Janessa brings this action

individually and on behalf of minor children M.N. and H.N. for the loss of society and companionship of their husband and father.

3.      Michael McIlvain was at all times material hereto a corrections officer employed by Douglas County and working at the Douglas County Jail under color of state law.  He is sued in his individual capacity.

4.      Heather White was at all times material hereto a corrections officer employed by Douglas County and working at the Douglas County Jail under color of state law.  She is sued in his individual capacity.

5.      Joshua DeLong was at all times material hereto a corrections officer employed by Douglas County and working at the Douglas County Jail under color of state law.  He is sued in his individual capacity.

6.      Defendant Douglas County is a political subdivision of the State of Wisconsin, organized and existing under and by virtue of the laws of Wisconsin.

7.      At all times material hereto, Douglas County was the entity charged with control and supervision over personnel working at the Douglas County Jail.

8.      MEnD Correctional Care, PLLC ("MEnD") is a professional limited liability company with its registered office located in Waite Park, Minnesota and its principal place of business located in Sartell, Minnesota.  At all times material hereto, MEnD fulfilled a public function and acted in concert with state actors, including Douglas County, by providing medical care to inmates and detainees at the Douglas County Jail.  As a result, MEnD and its employees, including but not limited to Jane Does 1-3, acted under color of state law for purposes of 42 U.S.C. § 1983.

9.      Defendant Todd Leonard, M.D. was at all times material hereto a medical doctor, the sole member of MEnD, and the medical director/supervisor at the Douglas County Jail with final policymaking authority with respect to the medical care received by inmates/detainees at the Douglas County Jail.  He is sued in his individual and official capacities.

10.      Jane Does 1-3 were at all times material hereto nurses or other correctional medical personnel employed by MEnD Correctional Care, PLLC, working at the Douglas County Jail.  They are sued in their individual capacities.

11.      At all times material hereto, Douglas County and MEnD engaged in a joint venture and worked in concert with one another to provide medical care to the inmates and detainees at the Douglas County Jail.

12.      The medical staff employed by MEnD, but working at the Douglas County Jail, are indistinguishable from Douglas County Jail employees from the perspective of inmates and detainees, provide services under the authority of Douglas County, and the inmates and detainees are provided no choice as to from whom they can receive medical services at the Douglas County Jail.

13.      Despite contracting with MEnD at all times material hereto, Douglas County owed a nondelegable duty of care to ensure that inmates/detainees at the Douglas County Jail received legally sufficient medical care.

14.      Upon information and belief, all individually named defendants, except Dr. Leonard, resided in Wisconsin at all times material hereto, and continue to reside in Wisconsin today.  Dr. Leonard resided and continues to reside in Minnesota.

15.     Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Eighth and/or Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(3).  The aforementioned statutory and constitutional provisions confer original jurisdiction over this action.

16.     This Court also has supplemental jurisdiction over any and all state law claims herein in accordance with 28 U.S.C. § 1367.

17.     Venue is appropriate in this Court.

18.     To the extent necessary, the damages Plaintiff seeks in this action reasonably exceed $75,000.00.

## Lance's Serious Medical Needs

19.     Lance was born in 1980 and raised in Cloquet, Minnesota.  He was 37 years old when he died.

20.     Lance and Janessa married and together had two children, M.N. and H.N., both of whom are presently minors.

21.     Together, the family lived in Scanlon, Minnesota.

22.     Scanlon is a small town and part of Carlton County, Minnesota, which borders Douglas County, Wisconsin.

23.     Lance was a carpenter by trade and member of the Carpenter's Union.

24.     Janessa was and is a public health nurse.

25.     In the years shorty preceding his own suicide, Lance's mother died, his close friend was murdered, and another close friend committed suicide.

26.     Lance struggled with grief following their deaths and used drugs to cope.

27.     Thereafter, Lance developed an addiction to methamphetamine, which led to familial and legal struggles.

28.     Lance developed severe depression with suicidal ideations.

29.     Lance was suicidal from 2015 until his death on February 6, 2018.

### The Beginning of Lance's Incarceration and Suicidal Ideations

30.     On June 26, 2015, Lance was arrested in Carlton County, Minnesota on various charges.

31.     One week later, Janessa called law enforcement and reported that Lance was sending her text messages stating that he was going to kill himself.

32.     Law enforcement arrested Lance for violating a no-contact order and took him to St. Luke's Hospital in Duluth to be evaluated "for depression with suicidal statements."

33.     Lance was then released to the Carlton County Jail.

34.     Upon admitting Lance into Carlton County Jail, a correctional guard performed a medical examination, consisting of visual observations and questioning Lance about his physical and mental health.  This examination stated that Lance's behavior suggested that he was a risk of suicide and that he also admitted to having prior thoughts of harming himself.

35.     On October 7, 2015, Lance entered into plea agreements in his two criminal cases and immediately therefore entered Hazelden in-patient program for 28 days.

36.     Lance underwent a mental health assessment at Hazelden.  The report stated:

5

> In addition to his depressed mood, the patient also endorses anhedonia, increased [sic] appetite, insomnia, feelings of hopelessness and helplessness about the future, and suicidal ideations. The patient reports he has had occasional thoughts of death and "not being around anymore" particularly in relation to his marital strain and legal consequences of use. He denies any history of suicidal intent, plans, or attempts. He also denies any current suicidal ideation. He denies any history of mania. Based on the pattern of symptoms endorsed, along with his patterns of use, the most appropriate diagnosis appears to be Amphetamine or other stimulant-induced depressive disorder with moderate or severe use disorder with onset during withdrawal.

37. Anhedonia is the inability to feel pleasure.

38. Lance's discharge summary for Hazelden also stated that Lance "reported having thoughts several times over the past few months of going to sleep and never waking up again."

39. The court sentenced Lance in both criminal matters on December 14, 2015, crediting him for jail time-served and placing him on probation.

**Lance's Struggles with Mental Health and Incarceration Continue**

40. Lance continued to struggle with drug addiction and mental health, and, over the next two years, violated the terms of his probation on multiple occasions.

41. Lance was sent back into Carlton County Jail to serve more time on multiple occasions for probation violations.

42. In September 2017, Lance returned to the Carlton County Jail for violating a no-contact order.

43. On September 11, 2017, Lance requested a change in his anti-depressant medication because his current medication was not working.

44.     On September 12, 2017, Lance filled out another inmate request for medical care form, stating: "sleep-been getting 0-2 hours of sleep at night."

45.     On September 20, 2017, Lance was found "continuously hanging towels from his bunk bed" and ordered to remove them by correctional guards.

46.     Inmates are prohibited from hanging sheets, towels, and clothes from bunk beds as a suicide prevention matter.

47.     The hanging of sheets, towels, and clothes from a cell bunkbed is a known warning sign of a potential suicide attempt.

48.     On September 21, 2017, Lance continued to hang towels off his bunk bed and was ultimately disciplined for violating jail policy.  He was placed in lockdown for a day and lost his jail privileges for twenty-four days.

49.     On October 18, 2017, Lance pled guilty and agreed to time-served and probation for two years on similar terms as before.  He was released from jail pending sentencing.

50.     On or around November 14, 2017, Lance returned to Carlton County Jail because of a probation violation.

51.     During the booking process, a correctional officer conducted another medical examination, wherein Lance disclosed that he used drugs and needles and was diagnosed with and taking medication for depression.

52.     Lance was prescribed bupropion—an antidepressant used to treat major depressive disorder.

53.     Lance was also prescribed mirtazapine—an antidepressant used to treat

7

major depressive disorder.

### Douglas County Jail Takes Custody of Lance

54.     On December 15, 2017, Carlton County transferred Lance to Douglas

County Jail in Douglas, County, Wisconsin.

55.     Carlton County Jail is a relatively small jail with only 48 beds.  The jail was

too small for the county's detention and incarceration needs.

56.     Thus, as early as 2006, Carlton County contracted with nearby Douglas

County, Wisconsin to detain and care for its overflow inmates on an as-needed basis.

57.     The contract provided it was Douglas County's responsibility to confine

Carlton County's inmates "in appropriate penal surrounds, consistent with the

requirements of federal and applicable state laws, and Administrative Codes governing

the operations of county jails[.]"

58.     In terms of medical services, the contract provided in relevant part:

> **10.     Medical Services:**  Inmates from the Buyer County
> shall receive such medical, psychiatric, and dental treatment as
> may be necessary to safeguard their physical and mental health
> and comply with the requirements of federal and state laws.
> Current Correctional Health Standards (NCCHC) shall be used
> as a guideline for the treatment of inmates.  Except in the case
> of emergency, the Provider shall contact the Buyer for prior
> approval for the medical, psychiatric, or dental expenses for
> which the Buyer is responsible under the terms of this contact.
>
> . . .
>
> Copies of county jail health care records of medical care
> provided during the inmate stay at the Provider County Jail
> shall be sent with the inmate upon return to the Buyer County.
> The medical record for each Buyer County inmate in the
> Provider County Jail shall be provided to the Provider County

8

Jail health care provider. The medical record remains the property of the Buyer County and may not be altered in any way. When the Buyer removes an inmate from jail, escapes, or is discharged/released by the Buyer, any record shall be returned to the Buyer. The Provider shall make copies of any record and retain such record as needed for the delivery of health care services.

59.     This provision regarding the exchange of medical records is essential to ensuring the inmate's continuity of care.

60.     The contract further required: "The Sheriff of Provider County shall keep all necessary and pertinent records concerning inmates in a professional and business-like manner." That would include the inmate's jail medical records.

61.     In exchange for housing Carlton County inmates, Douglas County received over $51.50 per day plus reimbursement for "all medical expenses, additional security costs, transportation expenses, and other costs incurred and provided for in this Agreement that are the responsibility of the Buyer."

62.     This contract was still active throughout all relevant times herein.

63.     In accordance with the terms of their contract, Carlton County Jail transferred copies of all of Lance's prior medical records to Douglas County Jail when Douglas County accepted custody of Lance.

64.     Therefore, as early as December 15, 2017, the correctional and medical workers at the Douglas County Jail, including MEnD staff, were on notice that Lance had serious medical health needs and presented as a risk for suicide.

65.     On December 15, 2017, Douglas County Jail classified Lance as medium-security and placed him in Huber-HC-a less secure area of the jail designed in part to

accommodate work-release inmates.

66.     Five days later, Lance was moved to "direct supervision."

67.     Lance was moved into the direct supervision because he posed a risk of suicide.

68.     The correctional guards that work at the Douglas County Jail know that inmates that pose a risk of suicide may be housed in the direct supervision unit.

69.     While Douglas County Jail has heightened classifications for inmates that are considered even higher risks of suicide (*i.e.*, active and contact supervision in "receiver cells"), jail policy specifically identifies "general population/direct supervision" as a classification for suicidal inmates:

**Classification of Suicidal Inmates:**

1. If officer(s) consider an inmate a low to moderate suicide risk-that is, the inmate presents somewhat of a risk but does not seem immediately suicidal and does not seem to be a candidate for initiation of an Emergency Detention, she/he will be place the inmate in one of the following housing areas, depending on the particular situation, availability of housing, etc.

   A. In General Population/Direct Supervision:  This is a good option for an inmate who seems to be having a difficult time and who may be having suicidal thoughts, and could benefit from being around people rather than alone.

70.     The medical and correctional staff at Douglas County Jail, including MEnD staff, knew that Lance was moved to direct supervision because he was a significant risk of suicide.

71.     Upon information and belief, Todd Leonard, M.D. ("Dr. Leonard"), as the

only MEnD medical doctor providing care to inmates at the Douglas County Jail, had this
knowledge in a direct or supervisory capacity.

72.     Despite Lance's obvious and significant risk of suicide, neither correctional
or medical staff at Douglas County placed Lance on stricter supervision with suicide
precautions, as he should have been.

**The Jails Transfer Lance Back-and-Forth Without Proper Suicide Precautions**

73.     Lance remained at Douglas County Jail until January 8, 2018, when he was
transferred back to Carlton County Jail.

74.     The next day, Lance filled out an inmate request for medical care form,
stating: "Need to speak with doctor about medications."

75.     Lance met with a doctor at Carlton County Jail the next day.  The doctor
noted that Lance was quiet, maintained poor eye contact, and demonstrated a depressed
mood and flat affect.  These are signs and symptoms consistent with depression and
suicidality.  The doctor increased his bupropion (anti-depressant medication) from 75
milligrams to 150 milligrams per day.

76.     Carlton County transferred Lance back to Douglas County Jail on January
25, 2018.

77.     In accordance with the contract, Carlton County transferred Lance's
updated medical records to Douglas County with Lance, putting Douglas County and
MEnD on notice of Lance's serious mental health and medical needs, including his risk
for suicidality.

78.     At Douglas County Jail, it is required that every time an inmate is

transferred into its custody the jail staff assess that inmate's potential for suicide based on information from the arresting or transporting agency.

79.     Douglas County Jail policy also states that "staff members will implement and complete initial classification procedures on inmates to the DCJ at the time of booking, or as soon as possible following booking, but in all events prior to placing any person in a group housing area."

80.     Defendant Heather White ("White") booked Lance into the Douglas County Jail on January 25, 2018.

81.     White knew that during Lance's prior stay at Douglas County Jail he was placed in direct supervision because he was a suicide risk.

82.     Despite her prior knowledge of Lance's suicidality and jail policies, White did not assess Lance's potential for suicide based on information from the transferring agency, as she was required to do, nor did she implement and complete the initial classification procedures as she was required to do to further assess his risk for suicide.

83.     Instead, White merely administered a medical health questionnaire consisting of six questions without comparing any of the answers to his prior jail records.

84.     Upon information and belief, Defendant Joshua DeLong ("DeLong") assisted Defendant White in booking, housing, and/or classifying Lance on January 25, 2018.

85.     DeLong also knew that during Lance's prior stay at Douglas County Jail that Lance was placed in direct supervision because he was a suicide risk.

86.     DeLong also knew that either he and/or White were required to assess

Lance's risk of suicidality, including the completion of a mental health screening form, but both DeLong and White either failed to do so or did so inadequately.

87.     Despite Lance's significant risk of suicide, White and/or DeLong placed Lance into Huber C-HC, Douglas County Jail's less secure unit.

### Lance's Mental Health Deteriorates and his Suicide Risk Increases

88.     On January 29, 2018, Lance was transferred back to Carlton County for the day to complete medical authorizations and a psychiatry questionnaire ahead of his psychiatric evaluation on February 5, 2018.

89.     While the February 5, 2018 psychiatric evaluation has been referred in at least one Douglas County record as "court-ordered," it is not clear that this evaluation was, in fact, court-ordered.

90.     Lance signed authorizations for Carlton County Jail to obtain his complete medical and mental health records from Hazelden and the Human Development Center.

91.     Lance then completed a two-page patient history questionnaire.

92.     In the questionnaire, Lance stated that he has suffered from severe depression for the last ten years and that gets worse when he is in jail and away from his family:



93.     In the questionnaire, Lance also stated that he had a drug problem and tried

both in-patient and out-patient treatment.

94.     Lance then relayed the serious psychiatric symptoms he was experiencing,

circling most, including thoughts of suicide and death:



95.     Carlton County then transferred Lance back to Douglas County Jail that

same day.

96.     In accordance with its contract, Carlton County provided Douglas County

Jail with Lance's updated medical records, including the questionnaire above.

97.     Upon retaking custody of Lance, the correctional guards at Douglas County

Jail again failed to complete another suicide assessment of Lance based on information

from the transferring agency Carlton County, another violation of the jail's suicide

prevention policy.

98.    The questionnaire and Lance's prior medical and jail history made it known to all correctional guards and medical staff at Douglas County Jail that Lance was a significant suicide risk.

99.    Despite this knowledge, correctional guard(s) rebooked Lance into Huber C-HC without suicide precautions.

100.    Upon information and belief, the correctional guard(s) that booked, classified, or otherwise were responsible for housing Lance in Huber C-HC were White and/or DeLong.

101.    On January 31, 2018, Lance was moved back to the direct supervision unit at the Douglas County Jail.

102.    Lance was moved back into the direct supervision because he posed a risk of suicide.

103.    Yet, despite his obvious high risk of suicide, correctional guards and medical staff at Douglas County Jail did not place Lance on stricter supervision with suicide precautions, as he should have been.

104.    Sometime before February 5, 2018, Carlton County Jail received Lance's medical records from Hazelden that again document Lance's history of suicidal ideations.

105.    Lance's medical records from Hazelden became part of Lance's medical file at the Carlton County Jail, and thus, in accordance with the terms of their contract, were shared with medical staff (i.e., MEnD) at the Douglas County Jail.

106.    Upon information and belief, Dr. Leonard had knowledge of the

information contained in these records on or before February 5, 2018.

## Lance's Last Day

107.    On the morning of February 5, 2018, Lance was transferred back to Carlton County Jail for a psychiatric evaluation.

108.    This medical evaluation was conducted by psychiatrist John Glick via video or telemedicine.  Lance was in the medicine room of Carlton County Jail being observed by jail nurse Laura Eng ("Nurse Eng").

109.    The interview lasted approximately 1.5 hours.  During that time, Nurse Eng documented: "During the interview, I observed Novak to appear nervous, legs were shaking, and he was persistently picking at his wrist band.  Inmate Novak answered Dr. Glick's questions with one word responses, did not make eye contact nor did he look towards the camera."

110.    In his evaluation report, Dr. Glick noted that Lance has been dealing with depression for the last 10 years and, that while his new medication may help at times, Lance "still sounds quite depressed."  Dr. Glick also noted Lance's "current depressive symptoms" for his questionnaire include "initial insomnia, decreased interest, guilt feelings, poor concentration, decreased activity, **thoughts of suicide or death**, low moods, upward mood swings, irritability, and anxiety symptoms."

111.    Dr. Glick reported that Lance was "not really forthcoming at all during the interview today and most of his answers were quite short and he was very non-disclosing."

112.    During the evaluation, Lance reported that he was experiencing shortness of

16

breath and "heart pounding with anxiety[.]"

113.   In terms of his mental status exam, Dr. Glick noted many of the same things that concerned Nurse Eng:

> . . . He was alert but attention span seemed decreased, as was his eye contact. He was distant in manner and not engaged and did not seem real comfortable with the interview. He did not offer any spontaneous information or speech and had no questions for me but did answer all my questions, usually with one or two-word answers. Affect appeared flat. Speech was soft and normal rate. Thought process seemed organized. There was no obvious evidence of psychosis. He denies hallucinations. Denies suicidal thoughts. No obvious indication or evidence for issues with insight or judgment at this time. In terms of movement, he was bouncing his leg a fair bit under the table and he also exhibited decreased eye contact.

114.   Dr. Glick diagnosed Lance with persistent depressive disorder (dysthymia), noting that he "currently appears to have symptoms c/o Major Depression," and severe amphetamine-type substance stimulant use disorder.

115.   Dr. Glick's and Nurse Eng's findings and observations were consistent with a patient who presented as a high risk for suicide.

116.   Dr. Glick then ordered that Lance's bupropion be increased to 150 milligrams twice per day.

117.   Thus, in less than one month, doctors increased Lance's antidepressant medication four hundred percent, from 75 milligrams of bupropion once a day to two daily doses totaling 300 milligrams.

118.   Following the evaluation, Nurse Eng shared her concerning observations about Lance's behavior during the interview with Dr. Glick. She also documented her

observations.

119.    Thereafter, Nurse Eng called Douglas County Jail's medical department (i.e., MEnD) and communicated Lance's medication change.

120.    Upon information and belief, Nurse Eng also communicated her concerning observations from Lance's psychiatric evaluation to Douglas County Jail's medical department.

121.    The MEnD medical staff at Douglas County Jail, including the medical provider Dr. Leonard, knew on February 5, 2018 that Lance had serious medical and mental health needs, including that he presented with signs and symptoms consistent with being a high risk for suicide.

122.    Yet, despite Lance's obvious high risk of suicide, neither Dr. Leonard nor anyone else from MEnD or Douglas County placed Lance on Emergency Detention or otherwise placed him on stricter supervision with suicide precautions, as he should have been.

123.    The identities of the jail medical staff working on February 5, 2018 are currently unknown, due to the spoliation of Lance's medical records as discussed below, and are therefore identified herein as Jane Does 1-3.

124.    Lance was transported back to Douglas County Jail later that afternoon.

125.    Lance did not talk the entire ride back to Douglas County Jail, except to ask what time it was.

126.    The correctional guards at Douglas County Jail knew that Lance was returning from a psychiatric examination.  They knew he was severely depressed and

posed a risk of suicide.  Upon information and belief, this includes White and/or DeLong.

127.    Upon his arrival at Douglas County Jail, the correctional guard receiving Lance, did not conduct an assessment as to whether Lance was suicidal based on the most recent information from Carlton County Jail, as policy required the correctional guard to do.

128.    Upon information and belief, the correctional guard or guards responsible for conducting this assessment or otherwise assessing Lance's risk for suicide were either Defendants White and/or DeLong, who were long aware of Novak's high risk of suicide but were indifferent to it.

129.    Lance was returned to the direct supervision unit at Douglas County Jail, even though a higher level of supervision was obvious and necessary.

130.    Lance was displaying the same concerning behaviors, or worse, as he did during the psychiatric examination: avoiding eye contact, nervousness, legs shaking, persistently picking at his wrist band, one-word answers and responses, and flat affect— all signs and risk factors for suicide.

131.    Indeed, an inmate in the cell next to Lance described him as appearing depressed when he returned from Carlton County.

132.    The correctional guards are trained to look for these risk factors of suicide and thus know they are risk factors for suicide.

133.    Lance made a phone call that evening to a female acquaintance and told her that he has not spoken to anyone and that "no one calls him."  This phone call was being monitored by the Douglas County Jail.

134.    Defendant Michael McIlvain ("McIlvain") was the correctional officer assigned as the rover for the direct supervision unit the evening of February 5, 2018.

135.    McIlvain was in charge of conducting wellbeing checks, at least every thirty minutes on a staggard basis.

136.    The Douglas County Jail policy on well-being checks states:

**Policy: The Douglas County Jail shall conduct Well-Being Checks for all inmates in the jail.**

**Rules:**

1. The jail staff shall make personal observation of each inmate at frequent and irregular intervals not to exceed every Half hour.

2. The jail staff shall document Well-Being checks in their respective shift log or "Timekeeper Pipe."

137.    On the evening of February 5, 2018, McIlvain knew: (a) Lance was severely depressed, (b) Lance was exhibiting signs of suicidality, (c) Lance had a history of suicidal thoughts, (d) Lance had just returned from a psychiatric evaluation, (e) Lance was placed in direct supervision because he posed a significant risk of suicide, and (f) that proper wellbeing checks prevent inmate suicides.

138.    Despite this knowledge, McIlvain failed to conduct proper wellbeing checks on the evening of February 5, 2018.

139.    McIlvain's "Time Keeper Pipe Downloaded Report" shows that he did not even attempt to perform some wellbeing checks that evening.

140.    The documentation shows that McIlvain performed a wellbeing check

around 10:30 p.m. and then waited a little over an hour to conduct his next wellbeing check, around 11:30-11:35 p.m.

141.    McIlvain reports that when he conducted this 11:30 p.m. wellbeing check, he "noticed that the window of room D110 was covered in toilet paper."  He further stated, "The light was on in the room, and this is common for inmates to do, when they are using the toilet, as they cannot shut/close their windows in that unit."

142.    D110 was Lance's cell.

143.    McIlvain did not even attempt to look in Lance's cell, nor did he tell Lance to remove the toilet paper or even talk to Lance to make sure he was alive.  Rather, McIlvain walked past the cell without regard for Lance's wellbeing.

144.    In his report, McIlvain stated to other officers afterwards that "he figured Novak was using the toilet."

145.    McIlvain did not personally observe Lance during this wellbeing "check."

146.    This is an improper and insufficient wellbeing check.

147.    It is well-established in the jail policy and in the federal courts that the purpose of wellbeing checks is to confirm life, not just that there is a human body in the cell.

148.    McIlvain failed to confirm Lance's life despite McIlvain's knowledge of Lance's high risk for suicide.

149.    Based on objective medical evidence, Lance was either hanging or preparing to hang himself from a sheet tied to his bedpost, and thus in the act of committing suicide, at the time McIlvain walked passed his cell.

150.    McIlvain's constitutionally and otherwise unlawful wellbeing "check" are common practice or custom in Douglas County Jail.

151.    Indeed, Deputy Izzard condoned the practice of not physically observing inmate or otherwise confirming life when the inmate puts toilet paper over his or her cell window.  Deputy Izzard even wrote in his report: "From my nearly 12 years of experience working in this jail, I know this to be common practice of inmates for privacy while using the bathroom."

152.    Upon information and belief, other inmates have either harmed themselves or others as a result of this unlawful and dangerous practice.

153.    The last proper observation of Lance occurred no later than 10:32 p.m. on February 5, 2018.

## Lance is Found Dead by Suicide

154.    At about midnight, Lance was found hanging, unresponsive from a sheet tied to the top of his bunk.

155.    Lance showed no signs of life when he was found at or around midnight.

156.    Lance's face was reported as "a dark purple color" at the time he was found.

157.    It was also reported that Lance had a bloated stomach and chest at the time he was found.

158.    Lance did not have a pulse, and, despite the chest compressions, the defibrillator never detected a heart rhythm to administer a shock.

159.    Paramedics arrived at 12:07 a.m. on February 6, 2018 and declared Lance

dead just minutes later.

160.   The cause of death was ligature hanging.

161.   The manner of death was suicide.

162.   Had Lance received proper medical attention and suicide assessment, which would have at a minimum resulted in closer medical monitoring, Lance more likely than not would not have died from ligature hanging.

163.   Had proper well-being checks been conducted of Lance, Lance more likely than not would not have died from ligature hanging.

164.   On April 22, 2019, the Wisconsin Department of Corrections reprimanded Douglas County for its many failures associated with Lance's death.

165.   The DOC's administrative review "found several violations of internal policies and procedures and administrative code violations."

166.   The DOC reprimanded Douglas County Jail for failing to complete a transport form documenting information from Carlton County to assess Lance's potential for suicide or self-harm on January 25, 2018.

167.   The DOC reprimanded Douglas County Jail for failing to complete a classification of Lance when he was booked into Douglas County Jail on January 25, 2018.

168.   The DOC reprimanded Douglas County Jail for failing to complete a transport form documenting information from Carlton County to assess Lance's potential for suicide or self-harm after he returned from his psychiatric examination on February 5, 2018—the very day he died.

169.    The DOC reprimanded Douglas County Jail for failing to perform and failing to conduct proper wellbeing checks of Lance on the evening of February 5, 2018—while he was in the act of committing death by suicide.

## MEnD's History of Deliberate Indifference

170.    At all times material herein, Douglas County contracted with MEnD Correctional Care, PLLC ("MEnD") to provide medical and mental health services to the inmates in its custody.

171.    MEnD was and is solely owned by Dr. Leonard, a family practice physician, who is the President and Chief Medical Officer of MEnD, and was also the Medical Director at Douglas County Jail during the time period at issue in this lawsuit. Since 2008, MEnD has advertised as providing "low cost" care to correctional facilities.

172.    MEnD contracted with and was providing its low-cost correctional care to over 35 different counties in Minnesota, Iowa, and Wisconsin as of February 5, 2018, including Douglas County.

173.    Dr. Leonard was the only medical doctor (M.D.) employed by MEnD who was providing services in Minnesota and Wisconsin on February 5, 2018.

174.    Dr. Leonard spends less than 10% of his time providing direct care to the thousands of inmates MEnD is responsible for, including on February 5, 2018.

175.    Rather than provide constitutionally oversight and care, MEnD attempts to premise its medical treatment on self-created, standardized forms and risk assessments that have no basis in diagnostic or interventional medicine.

176.    The sum of MEnD's business model is to save counties money through the

appearance of medical care by using made-up forms, while providing constitutionally deficient medical care with constitutionally deficient oversight by qualified providers.

177.   Given Dr. Leonard's personal history, it is difficult to comprehend how local governments could ever permit Dr. Leonard to be the sole supervisory medical doctor charged with the care of so many vulnerable inmates and detainees.

178.   On or around May 15, 2011, Dr. Leonard was reprimanded by the Minnesota Board of Medical Practice (the "Board").

179.   The Board found that, among other things:

> A review of [Dr. Leonard's] practice revealed that, on multiple occasions, [Dr. Leonard] authorized narcotics, but failed to document objective clinical findings to support the need for ongoing medications; failed to document an assessment for his patients' risk of chemical dependency, toxicity, diversion, or suicide; failed to document discussions regarding potential side effects of the drugs; failed to monitor the efficacy of the medications; failed to implement narcotic contracts or conduct biological fluid screens; and failed to recognize drug seeking behavior in his patients. [Dr. Leonard] also failed to address collateral health concerns or routine health maintenance care.

> A review of [Dr. Leonard's] practice also revealed that [Dr. Leonard] failed to appropriately maintain and adequately document his clinic records. [Dr. Leonard's] clinic notes were frequently cursory, incomplete, and illegible. [Dr. Leonard] often failed to document a diagnosis, adequate patient history, or a rationale for prescribed medications. On multiple occasions, [Dr. Leonard] prescribed controlled substances for his patients, but failed to adequately document the specific name of the medication, authorized quantity, or the strength of the medication in the clinic record.

180.   Indeed, Dr. Leonard has misrepresented his disciplinary history to at least one local government retaining MEnD's services.  *See* "Kare 11 investigates: 'Unethical' record of Minnesota's largest jail health care provider," Kare 11 (Dec. 10, 2020),

*available at* https://www.kare11.com/article/news/investigations/kare-11-investigates-unethical-record-of-minnesotas-largest-jail-health-care-provider/89-aed51ef6-ca37-4ace-b6d0-3e079389c9c9 (last accessed Jan. 31, 2021).

181.    MEnD's understaffing in an effort to provide low-cost medical care comes with a deadly price, as at least 25 inmates have died in MEnD's care since 2015.  *See id.*

182.    Many if not most, of those deaths since 2015 have been as result of suicide stemming from MEnD's deliberate indifference to the suicidality of its inmates and detainees.

183.    In 2010, MEnD was deliberately indifferent to the serious medical needs of Kyle Allan Baxter-Jensen.  In 2016, MEnD paid $850,000 to resolve claims of deliberate indifference against MEnD and Dr. Leonard for the suicide of Baxter-Jensen.

184.    In October 2017, MEnD was deliberately indifferent to the serious medical needs of Dylan Brenner ("Brenner") at the Sherburne County Jail (Minnesota), which resulted in Brenner's suicide.  This litigation remains pending.  *See Brenner v. Asfeld*, No.. 18-cv-2383 (D. Minn.).

185.    In November 2017, MEnD was deliberately indifferent to the serious medical needs of James Lynas, also at the Sherburne County Jail, which resulted in Lynas' suicide.  In Lynas, the court denied summary judgment and found in part, that genuine issues of material fact existed as to whether Lynas' death was caused by one or more of MEnD's unconstitutional customs.  *Lynas v. Stang*, Case No. 18-cv-2301, 2020 WL 4816375 (D. Minn. Aug. 19, 2020).

186.    In July 2017, MEnD was deliberately indifferent to the serious medical

needs of Stephanie Bunker, which resulted in Bunker's suicide.  This litigation remains pending.  *See Bunker v. Fitzgerald*, 20-cv-1456 (D. Minn.).

187.  MEnD's deliberate indifference to the serious medical needs of its inmates is further detailed in other federal civil rights litigation and publicly available news stories.  *See e.g., Perry v. Beltrami County*, 19-cv-2580 (D. Minn.); *see also Rudolph v. MEnD Correctional Care, PLLC*, 18-cv-1020 (D. Minn.); and *Valiant v. Leonard, MD et al*, 21-cv-72 (D. Minn.).

## MEnD's History of Misleading Documentation and Cover-ups Continues Here

188.  In furtherance of its custom of failing to provide constitutionally adequate medical care, MEnD maintains misleading documentation and alters that documentation or otherwise attempts to cover up its wrongdoings after harm befalls one of the inmates in its care.

189.  Thousands of medical documents likely exist at the Sherburne County Jail reflecting that they were signed by Dr. Leonard, when in fact they were not.

190.  After Brenner's suicide, MEnD coordinated the drafting of chart notes after Brenner's suicide.

191.  During the Brenner litigation, MEnD withheld the most basic, discoverable information that reflected Brenner's suicidality to such an extent that discovery sanctions were awarded against MEnD.

192.  After Bunker's suicide, MEnD altered Bunker's suicide risk screening form to conceal MEnD's knowledge of her suicidality.

193.  Following the death of Hardel Sherrell ("Sherrell"), at issue in the *Perry*

litigation referenced above, Dr. Leonard individually, on behalf of MEnD, and through the efforts of agents on his behalf, attempted to improperly silence a whistleblower (a former MEnD employee) from providing additional information about the constitutionally inadequate care provided by Dr. Leonard and MEnD to Sherrell.

194.    Here, MEnD claims it **lost Lance's entire medical file.**

195.    Plaintiff alleges that MEnD and/or others working on behalf of or in conjunction with MEnD, including but not limited to Douglas County employees, intentionally destroyed Lance's medical records avoid liability for Lance's foreseeable and unconstitutional death.

196.    The spoliation of Lance's medical records has and will hinder Plaintiff's ability to fairly prosecute this action absent adverse inference or some other appropriate sanction by the Court.

<u>**Count One**</u>

**42 U.S.C. § 1983**
**Eighth and Fourteenth Amendment Violations**
*Plaintiff  v. Michael McIlvain, Heather White, Joshua DeLong,*
*Jane Does 1-3, and Todd Leonard, M.D., all in their individual capacities*

197.    Plaintiff realleges and incorporates all allegations contained in this Complaint as if set forth fully herein.

198.    Lance suffered from serious medical needs.

199.    The Defendants named in this Count owed Lance a duty to provide for Lance's medical needs, safety, and general welfare.

200.    The Defendants named in this Count knew that Lance had serious medical

needs that created a high risk of harm, including suicide, if not properly assessed, addressed, and monitored.

201.   The Defendants named in this Count, under color of state law, acted with deliberate indifference to Lance's serious medical needs in several manners, as detailed herein and as shall be set forth with additional discovery.

202.   Plaintiff alleges in the alternative that each of these Defendants knew that Lance was suffering from these constitutional violations, had a realistic opportunity to intervene to stop these constitutional violations, but failed to intervene either maliciously or with reckless disregard for whether Lance's rights would be violated.

203.   As a result, the Defendants named in this Count engaged in conduct that was in violation of the Eighth and/or Fourteenth Amendments to the United States Constitution.

204.   Lance died as a direct and proximate result of acts and omissions by the Defendants named in this Count.

205.   Under this Count, Plaintiff is entitled to recover all compensatory and special damages allowable under federal common law and/or Wisconsin law individually, on behalf of Lance's children, and/or on behalf of the estate.   These damages include but are not limited to conscious pain and suffering, loss of enjoyment of life, medical expenses, exemplary and punitive damages, and the loss of Lance's support, services, society, and companionship.

206.   Punitive damages are available against the Defendants named in this Count and are hereby claimed as a matter of federal common law pursuant to *Smith v. Wade*,

461 U.S. 30 (1983).

207.    Plaintiff is entitled to recovery of costs, including reasonable attorneys'

fees, under 42 U.S.C. § 1988.

## Count Two

**42 U.S.C. § 1983**
**Eighth and Fourteenth Amendment Violations – *Monell Liability***
***Plaintiff v. Douglas County and MEnD***

208.    Plaintiff realleges and incorporates all allegations contained in this

Complaint as if set forth fully herein.

209.    Douglas County and MEnD acted under color of state law, as detailed

above.

210.    On, prior to, and after February 6, 2018, MEnD and its final policymakers

such as Dr. Leonard, with deliberate indifference to the rights of Lance and other

similarly situated inmates/detainees, tolerated, permitted, failed to correct, promoted, or

ratified a number of customs, patterns, or practices that that failed to provide for the

serious medical needs, safety, well-being, and welfare of inmates/detainees that presented

with serious mental health concerns, including suicidality.

211.    On, prior to, and after February 6, 2018, Douglas County had a non-

delegable constitutional duty to provide medical care to the detainees/inmates in its

custody.

212.    On, prior to, and after February 6, 2018, MEnD and Douglas County had

notice of MEnD's constitutionally deficient medical care and unconstitutional customs

and practices, yet with deliberate indifference to the rights of Lance and other similarly

situated inmates/detainees, employed MEnD and allowed MEnD to provide

constitutionally deficient medical care to Douglas County Jail detainees/inmates.

213.   MEnD's unconstitutional customs and/or practices included but were not

limited to:

      a.   Understaffing with respect to numbers and experience of staff;

      b.   Failing to provide adequate training regarding assessing inmates for
          suicidality;

      c.   Failure to implement the tools necessary for constitutionally sufficient
          mental health care, including suicidality;

      d.   Failing to properly assess inmate's risk of suicidality when transferred
          between Douglas and Carlton Counties; and

      e.   Engaging in a pattern of cover-ups to allow MEnD to continue operating
          or to otherwise allow MEnD to avoid oversite of its unconstitutional
          conduct.

214.   On, prior to, and after February 6, 2018, Douglas County had notice of its

own unconstitutional customs and practices, yet with deliberate indifference to the rights

of Lance and other similarly situated inmates/detainees, engaged in such unconstitutional

customs/practices.  These unconstitutional customs/practices included but were not

limited to:

      a.   Failing to conduct proper welfare checks and allowing inmates to
          prevent correctional staff from looking into their cells;

      b.   Failing to provide adequate training regarding suicidality; and

    c.  Failing to properly assess inmate's risk of suicidality when transferred between Douglas and Carlton Counties.

215.   Lance died as a direct and proximate result of acts and omissions by the Defendants named in this Count.

216.   Under this Count, Plaintiff is entitled to recover all compensatory and special damages allowable under federal common law and/or Wisconsin law individually, on behalf of Lance's children, and/or on behalf of the estate.   These damages include but are not limited to conscious pain and suffering, loss of enjoyment of life, medical expenses, and the loss of Lance's support, services, society, and companionship.

217.   Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## Count Three

### Ordinary and Professional Negligence
### *Plaintiff v. MEnD and Dr. Leonard*

218.   Plaintiff realleges and incorporates all allegations contained in this Complaint as if set forth fully herein.

219.   Dr. Leonard and MEnD failed to use the degree of care, skill and judgment which reasonable correctional healthcare professionals would exercise in the same or similar circumstances having due regard for the state of medical science at the time of Lance's presentation and obvious mental health needs.  Dr. Leonard's and MEnD's negligence includes but is not limited to failing to recognize the serious and obvious nature of Lance's mental health condition, failure to provide appropriate mental health

care, and failing to timely transfer him to a mental health provider that was equipped to treat his serious suicidal ideation and the failure to preserve his jail medical records.

220.    As a direct and proximate result of Dr. Leonard's and MEnD's negligence, Plaintiff Lance physically suffered, including extreme conscious pain and suffering, incurred additional medical expense, and then died.

221.    As a direct and proximate result of Dr. Leonard's and MEnD's negligence, Plaintiff and Lance's minor children have lost the support, services, society and companionship of their husband and father all to their damage in an amount to be determined at trial.

222.    As a direct and proximate result of Dr. Leonard's and MEnD's negligence, Plaintiff and the estate incurred funeral expenses and other pecuniary loss.

223.    Under this Count, Plaintiff is entitled to recover all compensatory and special damages allowable under Wisconsin law individually, on behalf of Lance's children, and/or on behalf of the estate.   These damages include but are not limited to damages for conscious pain and suffering prior to his death and for exemplary and punitive damages.

224.    MEnD is vicariously liable for its agents acts and omissions as stated herein, including but not limited to the acts and omissions of Jane Does 1 – 3 and Dr. Leonard.

225.    Dr. Leonard and MEnD have professional liability insurance for Plaintiff's claims, and that insurer is directly liable to Plaintiff for the damages stated herein.

226.    To the extent applicable in this federal court action, Plaintiff shall file a

request for mediation, within 15 days of filing, pursuant to Wisconsin Statute § 655.44.

## Count Four

### Wrongful Death—Negligence
### *Plaintiff v. McIlvain, White, DeLong, and Douglas County*

227.    Plaintiff realleges and incorporates all allegations contained in this Complaint as if set forth fully herein.

228.    The Defendants named in this Count owed Novak a duty to provide for Novak's well-being and safety.

229.    The Defendants named in this Count knew or should have known that Novak was at a high risk of suicide, given his medical history and current medical condition.

230.    It is foreseeable that inmates and detainees who are not properly screened, assessed, monitored, or supervised, such as Novak, pose a danger to themselves, including a risk of suicide.

231.    The Defendants named in this Count failed numerous ministerial duties, including: (a) conducting proper assessments of Novak's potential for suicide; (b) providing Novak with supervision and suicide precautions that were appropriate for his high risk of suicide; and (c) conducting proper well-being checks.

232.    The Defendants named in this Count breached each of these ministerial duties and more.

233.    Douglas County is directly liable for its failure to establish and/or enforce policies and procedures to ensure proper assessments and monitoring of Douglas County

Jail detainees/inmates.

234.    Douglas County is vicariously liable for the acts and omissions of McIlvain, White, DeLong, and the other correctional officers, as described within this Complaint.

235.    As a direct and proximate result of these wrongful acts and omissions, Novak's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

236.    The Defendants named in this Count had actual notice of all acts and claims described within this Complaint.

237.    Plaintiff submitted a demand/claim to Douglas County dated January 13, 2021, and pursuant to Wis. Stat. § 893.80(1d).

238.    Defendant Douglas County issued a Notice of Disallowance dated February 16, 2021, and pursuant to Wis. Stat. § 893.80(1g).

239.    Plaintiff complied with all statutory conditions precedent to filing suit against the Defendants named in this Count for state law/wrongful death claims more fully described above.

## **Prayer for Relief**

WHEREFORE, Plaintiff hereby prays for judgment against Defendants as follows:

1.    As to Count One, a money judgment against Michael McIlvain, Heather White, Joshua DeLong, Todd Leonard, M.D., and Jane Does 1-3, for compensatory, special, and punitive damages in an amount to be determined by jury, together with costs,

including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest, in an amount to be determined by jury;

2.      As to Count Two, a money judgment against Douglas County and MEnD for compensatory and special damages in an amount to be determined by jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest, in an amount to be determined by jury;

3.      As to Count Three, a money judgment against MEnD and Todd Leonard, M.D., for compensatory, special, exemplary and/or punitive damages in an amount to be determined by jury, together with costs and prejudgment interest, in an amount to be determined by jury;

4.      As to Count Four, a money judgment against Michael McIlvain, Heather White, Joshua DeLong, and Douglas County, for compensatory, special, exemplary, and other damages in an amount to be determined by jury, together with costs and prejudgment interest; and,

5.      All other relief this Court deems just and equitable.

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY.**

**Dated: June 2, 2021**

**SIEBENCAREY, P.A.**                          **NEWMARK STORMS DWORAK LLC**

/s/ Jeffrey M. Montpetit                        /s/ Jeffrey S. Storms
Jeffrey M. Montpetit, MN #291249                /s/ Paul C. Dworak
901 Marquette Avenue, Suite 500                 Jeffrey S. Storms, MN #387240
Minneapolis, MN 55402                           Paul C. Dworak, MN #391070
Telephone: 612.333.4500                         150 South Fifth Street, Suite 1850
Fax: 612.455.7051                               Telephone: 612.455.7050
jeffrey.montpetit@knowyourrights.com            Fax: 612.455.7051
                                                jeff@newmarkstorms.com
                                                paul@newmarkstorms.com

*ATTORNEYS FOR PLAINTIFF*