IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JANESSA NOVAK, individually and as
special administrator for the Estate of
Lance Novak, deceased, and on behalf of
M.N. and H.N., minor children of the
deceased,

                          Plaintiffs,                          OPINION and ORDER

    v.                                                       21-cv-81-jdp

MICHAEL McILVAIN, in his individual capacity,
TODD LEONARD, M.D., in his individual capacity,
NANCY BLODGETT, in her individual capacity,
DOUGLAS COUNTY, and MEnD CORRECTIONAL
CARE, PLLC,

                          Defendants.

---

On February 5, 2018, Lance Novak was in jail custody, having been arrested in

November 2017 for a probation violation. He had been in and out of jail since 2015, and he

had been struggling with depression for much longer. Earlier in the day, a psychiatrist

conducted a mental health assessment of Novak and determined that he was not suicidal. But

the psychiatrist was wrong: a few hours later, Novak hung himself in his jail cell, and jail staff

did not find him until it was too late to save him.

Novak's wife and two children brought this lawsuit under the Eighth Amendment to

the U.S. Constitution and Wisconsin common law. Plaintiffs don't blame the psychiatrist for

failing to predict what Novak was about to do. They also don't blame a jail physician who

examined Novak a month earlier and also determined that Novak wasn't suicidal. Instead,

plaintiffs allege that defendants MEnD Correctional Care, PLLC (a medical contractor), Todd

Leonard (MEnD's owner), and Nancy Blodgett (a MEnD nurse) disregarded known risks that

Novak was suicidal, that defendant Douglas County failed to exercise any control over MEnD and knew that the jail's system of conducting welfare checks on inmates was constitutionally inadequate, and that defendant Michael McIlvain (a correctional officer) was negligent in conducting those checks. Defendants, in two groups, move for summary judgment on all claims. Dkt. 76 (by MEnD, Leonard, and Blodgett) and Dkt. 82 (by Douglas County and McIlvain).

Plaintiffs point to strong evidence that each defendant was negligent: Blodgett failed to follow MEnD's suicide prevention policies when Novak entered the jail, she tried to hide her failure after the fact by falsifying records, and she failed to comply with a doctor's order to increase the dose of Novak's medication; MEnD failed to ensure that its employees were following its policies; the county provided little oversight of MEnD; and McIlvain violated county policy by waiting almost 90 minutes between checks on Novak the night he died, including almost 30 minutes after McIlvain saw that Novak's cell window was covered with toilet paper. All of these failures are troubling, and they suggest that both MEnD and the county should take a careful look at their suicide prevention policies and practices and identify areas of improvement that could prevent further tragedies like this one.

But it is well established that the Eighth Amendment requires the plaintiff to prove more than just negligence or even gross negligence. *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 566 (7th Cir. 2021). Among other things, the plaintiff must prove both that the defendant knew of a strong likelihood that the inmate would commit suicide and that there is a causal connection between the inmate's suicide and the defendant's failure to act based on that knowledge. Plaintiffs haven't met of either of those elements.

Blodgett knew that Novak suffered from depression, but she didn't have notice that he was suicidal: he had never attempted suicide in the past, he had never been placed on suicide

watch, no medical or mental health professional had ever determined that he was suicidal, he denied any intent to kill himself, he wasn't asking for counseling, and he wasn't engaging in strange behavior at the jail. Even with the benefit of an adverse inference about the content of missing documents (an issue the court will discuss in detail in the opinion), no reasonable jury could find that any of the defendants knew that Novak was suicidal.

Plaintiffs also fail on the element of causation. A physician evaluated Novak's mental health less than a month before he killed himself, and a psychiatrist evaluated Novak only a few hours before he died. Both doctors determined that Novak wasn't suicidal. It's true that these evaluations occurred no thanks to defendants: the physician was employed by a different jail and the psychiatric assessment was ordered by the sentencing court. But this doesn't mean that the assessments can be ignored. Regardless of why the assessments occurred, they are compelling evidence that MEnD employees wouldn't have prevented Novak's suicide, even if they had performed the screenings they should have, and plaintiffs point to no contrary evidence. Plaintiffs also fail to show any causal connection between Novak's medication dose and his suicide, so MEnD and Blodgett are entitled to summary judgment on the Eighth Amendment claims.

As for the county's policy on conducting wellness checks, plaintiffs haven't shown that the county had a formal or informal policy that was constitutionally inadequate. So the county is also entitled to summary judgment on the Eighth Amendment claims.

As for plaintiffs' state-law claims, the general rule is that the court should not resolve state-law claims in a case like this one in which the court has jurisdiction over the claims solely because they are related to federal claims that are being dismissed. No party identifies a reason

to keep the state-law claims, so if plaintiffs want to pursue those, they will have to do so in state court.

BACKGROUND

The following facts are taken from the parties' proposed findings of fact and the record. They are undisputed unless otherwise noted.

## A. Novak's first placement in Douglas County jail

Novak had been in and out of jail since 2015 for a domestic violence conviction and subsequent probation violations. He was arrested again in November 2017. He was first detained in St. Louis County jail (in Minnesota) and then transferred, first to Carlton County jail (also in Minnesota) and then to Douglas County jail, just across the border in Wisconsin, because of overcrowding at Carlton. The day he was transferred to Douglas, December 15, 2017, his probation was revoked, and he received a 90-day jail sentence.

MEnD had a contract with Douglas County to provide medical care to inmates at both the Carlton County and Douglas County jails. Defendant Todd Leonard owns MEnD. Defendant Nancy Blodgett worked for MEnD as a nurse supervisor at Douglas.

Novak had received a health screening when arriving at the Carlton County jail. The screening revealed that Novak had been diagnosed with depression and had a history of using methamphetamines, but he denied suicidal ideation or past suicide attempts. Dkt. 78-13, at 2 and Dkt. 78-14, at 5. The day before he was transferred from Carlton to Douglas, Carlton staff prepared a "transfer checklist" that included questions related to mental health. Carlton staff circled "no" in response to the questions "Any mental health concerns?" and "Any past or present suicidal tendencies?"

A Douglas booking officer conducted a "mental intake screening" when Novak arrived. According to the screening form, Novak didn't show signs of being suicidal, and he answered "no" when asked whether he had ever attempted suicide and whether he was thinking of hurting or killing himself. Dkt. 83-9. He disclosed that he was taking bupropion and mirtazapine, which are both antidepressants. After the booking process, Douglas jail staff completed a "classification notice" for Novak. Dkt. 51-17. Staff did not check any of the boxes for classifying Novak as "high risk," including the box for "suicidal."

Both jail policy and Wisconsin law required nursing staff to provide health assessments for new inmates within 14 days. Under MEnD's policy, if the initial assessment revealed any mental health diagnosis or chemical dependency history, the nurse was required to perform additional mental health screenings, including a suicide screening, and make "a referral to the jail medical provider, mental health professional, or both for follow-up." Dkt. 128, ¶ 104. If an inmate refused to cooperate with the mental health assessment, the nurse was required to "notify [the] medical health provider or mental health professional for further instruction." Dkt. 128, ¶ 112. Blodgett was working the day of Novak's transfer, but defendants have provided no documentary evidence that Blodgett or other MEnD nursing staff performed a suicide screening or other health assessment when Novak was transferred to Douglas in December 2017.

## B.  Transfer to Carlton County jail

On January 8, 2018, Novak was transferred back to Carlton. Before the transfer, MEnD nurse John Jordan prepared a document called "health transfer summary." Dkt. 81-20. Included on the form were checkboxes for "behavioral/mental health information and observations" from the previous two weeks, including "suicide attempts/threats" and "self-

5

abusive behaviors." The box for "none observed" is checked. Jordan's general practice was to review an inmate's "nursing notes and current medical information in order to complete" the transfer summary, but Jordan doesn't remember what he did before preparing Novak's transfer summary. Dkt. 73 (Jordan Dep. 16:7–9, 19:5–10).

On January 9, Novak submitted a request to Carlton staff to "speak with doctor about medications." Dkt. 78-14, at 26, 36. On January 11, Novak was seen by Kenneth Ripp, a physician who was the medical director of the Carlton County jail. Ripp had previously examined Novak on September 12, September 19, and October 18, 2017.  The September 12 appointment was a screening after an arrest; on September 19, Novak complained about difficulty sleeping; and on October 18, Ripp again examined Novak after a new arrest. Ripp observed during these earlier examinations that Novak was depressed, and Ripp made adjustments to his medications. But Ripp didn't indicate in his notes that Novak expressed suicidal ideation or that Ripp believed Novak was suicidal.

 According to Ripp's January 11 notes, Novak reported that his depression medications "have helped," that he was "sleeping well," and that he had a good appetite. *Id.* But Ripp also observed that Novak was quiet, made poor eye contact, and appeared depressed. *Id.* Ripp concluded that Novak wasn't suicidal, but he prescribed 150 milligrams of buproprion. Novak was already taking 75 milligrams of buproprion, but 150 milligrams is the "standard, starting dose." Dkt. 71 (Ripp Dep. 48:15–17).

## C.  Return to Douglas County jail

On January 25, 2018, Novak returned to Douglas. A booking officer conducted a "medical intake screening" for Novak. Dkt. 78-21. According to the screening, Novak didn't show signs of being suicidal, and he answered "no" when asked whether he had ever attempted

suicide and whether he was thinking of hurting or killing himself. He disclosed that he had been diagnosed with depression and that he was taking bupropion and mirtazapine.

On January 26, Blodgett conducted a health assessment for Novak as part of the intake process. On the portion of the form related to mental health, Blodgett wrote that Novak had a mental health diagnosis for depression and had a chemical dependency on methamphetamines "a year ago," but he denied suicidal ideation or past suicide attempts. Dkt. 78-22, at 22. She did not fill out the portions of the form related to "level of consciousness," "orientation," or "affect/behavior." Because Novak had a mental health diagnosis, MEnD policies required Blodgett to fill out other forms related to Novak's mental health, including a more thorough suicide screening. Blodgett testified that she conducted a suicide screening showing that Novak was at a low risk, but she failed to document the screening at the time. Plaintiffs dispute the accuracy of the suicide screening form that Blodgett prepared.

On January 27, Novak used Douglas's electronic kiosk system to complain that he was getting only 75 milligrams of his bupropion when he should be getting 150 milligrams. Dkt. 78-25. A nurse who isn't a defendant responded that Novak is "to be increased after [his] 75mg tablets are gone" and that he hadn't "changed over to the increase yet because [he] still [had] the 75mg left." *Id.*

Novak wrote again on January 28, asking Douglas staff to contact Carlton because he was getting 75 milligrams of bupropion instead of 150 milligrams. In response, Blodgett wrote that Novak was "ordered one 75mg tablet," and he should "put an inquiry into mental health if [he believed that] it is not covering [his] depression."

On January 29, Novak wrote that the doctor at Carlton had changed his prescription two weeks earlier, and he again asked nursing staff to contact Carlton for confirmation. In

response, Blodgett wrote, "We spoke to the nurse in Carlton today. You are getting the correct dose. I will call there again tomorrow." There is no record that Blodgett called Carlton, and she doesn't remember doing so.

On January 30, Novak wrote that he was still getting 75 milligrams of bupropion instead of 150 milligrams. He asked staff to contact Carlton if they had questions. A nurse who isn't a defendant responded that she put Novak "on the Providers review list" and will "let [Novak] know as soon as [the nurse has] an answer."

Novak filed a grievance about his medication dosage on January 29. On January 31, a nurse who isn't a defendant wrote, "We must go through our Provider and verify the medication change." On February 1, Blodgett wrote, "This was addressed by the provider yesterday and your medication order was changed." Novak filed no other inquiries or grievances after January 30.

## D. Psychiatric assessment

On January 29, Novak returned to Carlton for one day to fill out a two-page "patient history questionnaire" for a psychiatric assessment that was required as part of his sentence. Dkt. 78-2, at 172–76 and Dkt. 78-14, at 22–23. The first page asked Novak to circle symptoms he was experiencing. Under "psychiatric," Novak circled "yes" for "Thoughts of suicide or death," as well as "Insomnia/poor sleep," "Poor interest," "Guilty feelings," "Poor concentration/memory," "Changes in activity level," "Low mood depression," "Upward mood swings," "Excessive worry/fearfulness," "Panic attacks," "Social fears," "Irritability," and "Memory loss." He circled "no" for "Suicidal plans," "Phobias or avoidance," "Repetitive thought/compulsive action," "Hyperactivity," "Aggressive behavior," "Lying/Stealing/Running away," and "Thoughts controlled by others." The questionnaire was forwarded to John Glick,

the psychiatrist who was performing the assessment, and it became part of Novak's Carlton medical file.

On February 5, Novak was transferred to Carlton again. Glick interviewed Novak by video conference for an hour and a half. At the conclusion of the interview, Glick diagnosed Novak with persistent depressive disorder but determined in his report that Novak was "not suicidal at this time." Dkt. 78-28. Glick based this determination on his interview, the questionnaire, some of Novak's medical records from Carlton, and Novak's medication list. Glick observed that Novak was on a "low dose" of bupropion, and Glick increased Novak's prescription to 150 milligrams, twice per day. Glick made no other treatment recommendations.

Glick's report was not sent to Douglas, and Glick had no contact with Douglas staff. But Laura Eng, a Carlton nurse who observed the interview, informed Douglas nursing staff of the medication change. Eng communicated no other information to Douglas about the interview.

**E.  Novak's suicide**

Novak returned to Douglas around 4:30 p.m. Blodgett had left the jail about an hour earlier.

At 10:00 p.m., inmates were locked in their cells and their lights were turned off. After lights off, Douglas County policy requires jail staff to "make a personal observation of each inmate at frequent and irregular intervals not to exceed every half hour," which the parties call a "wellbeing check." Dkt. 121, ¶ 104. At 10:32 p.m., a correctional officer who isn't a defendant made a wellbeing check on Novak and the other inmates in his unit. Defendant Michael McIlvain, also a correctional officer, was scheduled to do the wellbeing checks between 11 p.m.

and midnight. He says that he missed the 11 p.m. check because "someone was taking their lunch break." Dkt. 91, at 81:15–16.

When McIlvain walked through Novak's unit at 11:35 p.m., Novak's cell window was covered with toilet paper. That didn't concern McIlvain because inmates often did the same thing when they wanted privacy while using the bathroom. When McIlvain returned to Novak's cell a few minutes before midnight, Novak's window was still covered.

McIlvain knocked on Novak's cell door, but he received no answer, so he peeked through an opening in the toilet paper. He saw Novak hanging from a sheet, which was tied to a bedpost. McIlvain radioed for help, cut the sheet that Novak was hanging from, and began CPR. Paramedics arrived shortly thereafter, and they pronounced Novak dead at 12:24 a.m.

The court will discuss additional facts as they become relevant to the analysis.

ANALYSIS

Plaintiffs assert Eighth Amendment claims against defendants Nancy Blodgett, Todd Leonard, MEnD Correctional Care, and Douglas County; negligence claims against Leonard and MEnD; and wrongful death claims against Michael McIlvain and Douglas County. On a motion for summary judgment, the question is whether there are any genuine factual disputes that could make a difference to the outcome of the case, or, stated another way, whether a reasonable jury could find for the nonmoving party, after drawing all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co., LLC,* 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

The court will first consider the Eighth Amendment claims against the individual defendants, then the Eighth Amendment claims against MEnD and the county, and finally the state-law claims.

## A. Eighth Amendment claims against the individual defendants

The standard for an Eighth Amendment claim about conditions of confinement, including a claim based on a failure to prevent a suicide, is based on the concept of "deliberate indifference."[1] This requires the plaintiff to prove four things: (1) there was a strong likelihood that the inmate would seriously harm himself; (2) the defendant was aware of that risk; (3) the defendant consciously failed to take reasonable measures to stop the inmate from harming himself; and (4) the inmate would have survived if the defendant had not disregarded the risk. Federal Civil Jury Instructions of the Seventh Circuit § 7.19 (2017); *Rosario*, 670 F.3d at 820–21. In this case, defendants focus on the second and fourth elements.

### 1. Nancy Blodgett

The parties dispute three primary issues related to plaintiffs' claim against Novak: (1) whether the evidence in the record would allow a reasonable jury to find that Blodgett knew that Novak was suicidal; (2) if not, whether plaintiffs are entitled to an adverse inference

---

[1] The Eighth Amendment applies to claims of convicted prisoners. *Collins v. Al-Shami*, 851 F.3d 727, 731 (7th Cir. 2017). Defendants contend that the Eighth Amendment governs the conditions of confinement for a person like Novak who was in custody because his parole was revoked, and plaintiffs also assume in their briefs that the Eighth Amendment applies, so the court will do the same. Some of the cases cited in this opinion were decided under the Fourteenth Amendment rather than the Eighth Amendment because the inmate was a pretrial detainee rather than a convicted prisoner. Fourteenth Amendment claims are now governed by an "objective reasonableness" test, but before *Pittman by & through Hamilton v. Cnty. of Madison, Illinois*, 970 F.3d 823, 827 (7th Cir. 2020), courts in this circuit applied a deliberate indifference standard to both Eighth Amendment and Fourteenth Amendment claims about failure to prevent a suicide attempt. *See, e.g., Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012).

because Blodgett destroyed evidence, and, if so, whether the adverse inference would be enough to reasonably infer Blodgett's knowledge of the risk; and (3) regardless of whether Blodgett knew that Novak was suicidal, whether a reasonable jury could infer that Novak would have survived if Blodgett had acted as plaintiffs say she should have.

### a. Awareness of the risk

The Eighth Amendment imposes a subjective standard. Even if a defendant should have known that an inmate was suicidal, there's no liability unless the defendant actually did know about a substantial risk of suicide. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Steidl v. Gramley*, 151 F.3d 739, 740 (7th Cir. 1998).

Plaintiffs rely on the following evidence to show that Blodgett was aware of a substantial risk that Novak would commit suicide on February 5, 2018:

- A July 2015 arrest record alleging that Novak had sent his wife a "text talking about suicide." Dkt. 36-29, at 5.

- A July 2015 health screening form from Carlton County jail indicating that Novak had "thought about" harming himself in the past. *Id.* at 3.

- A September 2017 booking record from Carlton stating, "Wife made comments he 'wasn't right' and may be suicidal." Dkt. 36-32, at 3.

- Two September 2017 and an October 2017 clinic notes from Carlton in which Kenneth Ripp, the jail physician, wrote the letters S, I, G, E, C, A, P, S and put checkmarks by all of the letters except I. Dkt. 78-14, at 45, 47.[2]

- A September 2017 clinic note from Carlton in which Ripp increased Novak's Lexapro prescription and wrote "monitor for now" and "f[ollow] u[p] in 1–2 weeks." Dkt. 36-33.

---

[2] Ripp explained in his deposition that the letters stood for sleep changes, decreased interest, feelings of guilt, decreased energy, decreased concentration, appetite changes, psychomotor changes, and suicidal ideation, and that the check marks indicated that Novak reported those symptoms during the examination. Dkt. 71 (Ripp Dep. 28:19–29:2).

- A November 2017 booking record from Carlton in which Novak disclosed that he suffered from depression, was taking medication for depression, and had been using methamphetamines ten months earlier. Dkt. 36-35, at 1.

- Two November 2017 and December 2017 medication records from Carlton that include the handwritten word "Watch" without explanation. Dkt. 105-19.

- MEnD training materials indicating that suicide is more common among white, middle-aged males, and people with histories of mental illness and drug abuse. Dkt. 36-19.

- Medical inquiries and grievances from Novak in late January 2018 that he was getting only 75 milligrams of bupropion when he was prescribed 150 milligrams; Blodgett's response on January 29 that Novak was getting the correct dose, but she would check with Carlton; and Blodgett's testimony that she doesn't remember calling Carlton. Dkt. 36-42; Dkt. 36-43; Dkt. 45 (Blodgett Dep. 43:1–47:19).

- A patient-history questionnaire that Novak filled out while at Carlton on January 29, 2018, in which he wrote that he'd been suffering from "severe" depression for ten years and on a list of psychiatric symptoms he circled "yes" next to "thoughts of suicide or death" and "low mood/depression"; he circled "no" next to "suicidal plans." Dkt. 36-44.

The court will analyze this evidence in two groups: (1) the evidence from Novak's previous incarcerations; and (2) the evidence from after Novak's transfer to Douglas on December 15, 2017.

**Records from previous incarcerations.** A threshold problem for plaintiffs is that Blodgett denies that she was aware of the information from his previous incarcerations at Carlton, and they haven't adduced evidence to the contrary. Plaintiffs point to agreements between Carlton and Douglas to share inmate medical records, Dkt. 128, ¶¶ 135–36, 278, so it's reasonable to infer that Carlton gave Douglas copies of Novak's medical records.[3] But

---

[3] Some of Novak's medical file from Douglas is missing, which is why it isn't clear which records were available to Blodgett. The court will discuss that issue further in § A.1.b.

drawing that inference doesn't help plaintiffs because they don't to point to any evidence that Blodgett actually reviewed those records or even that she was supposed to review them.

But even if the court assumes that Blodgett reviewed Novak's records from Carlton, those records are either too old or too vague to give notice to Blodgett that Carlton staff had erred in failing to classify Novak as a high suicide risk. Those records don't disclose the red flags that the court of appeals has identified in other cases, such as past acts of self-harm or threats of self-harm, determinations by a doctor or staff that the inmate was suicidal, placement in high-risk housing, requests for crisis counseling, or strange behavior in jail. *See, e.g., Est. of Clark v. Walker*, 865 F.3d 544, 547 (7th Cir. 2017) (past suicide attempts and placement on suicide watch); *Pittman ex rel. Hamilton v. Cnty. of Madison, Ill.*, 746 F.3d 766, 777–78 (7th Cir. 2014) (past placements on suicide watch, request for counseling, and crying); *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 990 (7th Cir. 2012) (history of self-harm and suicide attempts); *Cavalieri v. Shepard*, 321 F.3d 616, 620–21 (7th Cir. 2003) (past placement on suicide watch and threat to commit suicide); *Sanville v. McCaughtry*, 266 F.3d 724, 737–38 (7th Cir. 2001) (statements from inmate that he was suicidal and past suicide attempts); *Hall v. Ryan*, 957 F.2d 402, 405 (7th Cir. 1992) (past suicide attempts and threats and "bizarre" behavior on night of suicide).

There were records indicating that Novak had suicidal thoughts in 2015 and that Novak's wife was concerned in September 2017 that Novak "may be suicidal," though the document from 2017 doesn't disclose why his wife was concerned. But even if such evidence could provide notice of a risk of suicide, the court of appeals has repeatedly held that the defendant must be aware of the risk that the inmate will "imminently" take his own life. *See, e.g., Johnson v. Garant*, 786 F. App'x 609, 610–11 (7th Cir. 2019); *Pittman*, 746 F.3d at 779-80;

14

*Miller v. Harbaugh*, 698 F.3d 956, 962 63 (7th Cir. 2012); *Minix v. Canarecci*, 597 F.3d 824, 831–32 (7th Cir. 2010). Information from months or years earlier would not provide such notice, particularly when the inmate was denying to Douglas and MEnD staff that he was currently suicidal and no staff from the Novak's previous facilities had flagged him as high risk.

The court of appeals has repeatedly observed that the risk of inmate suicide "is concentrated in the early days and even hours of being placed in jail, before the inmate has had a chance to adjust to his dismal new conditions." *Boncher ex rel. Boncher v. Brown Cnty.*, 272 F.3d 484, 486 (7th Cir. 2001); *see also Belbachir v. Cnty. of McHenry*, 726 F.3d 975, 980–81 (7th Cir. 2013). And in most of the cases cited above in which court found potential liability for failing to prevent an inmate's suicide, the inmate had died within a few days of detention. *See Est. of Clark*, 865 F.3d at 546 (five days); *Est. of Miller*, 680 F.3d at 988 (three days); *Cavalieri*, 321 F.3d at 620 (same day); *Hall*, 957 F.2d at 403 (same day). In the others, the inmate's behavior changed just before the attempt. *Pittman*, 746 F.3d at 772 (crying for hours at a time); *Sanville*, 266 F.3d at 731 (threats to commit suicide). But in this case, Novak had been in and out of jail for years, he had been continuously detained for more than a month when he was transferred to Douglas, and plaintiffs point to no evidence that his behavior changed significantly before his suicide attempt.

As for Dr. Ripp's clinic notes and the medication records, they are are simply too vague to suggest that Novak was suicidal. The notes include handwritten initials related to mental-health symptoms, but the notes don't explain what the initials mean, and plaintiffs don't cite any evidence that Blodgett would have understood without an explanation. The note to "monitor for now" is on a portion of a form devoted to instructions for the *inmate* to follow, and the note doesn't explain what is being monitored or why. Dkt. 36-33. Ripp explained in

his deposition that the note was meant to be to himself and "the nurse" to monitor the effect of Novak's new medication, not to monitor Novak for a possible suicide attempt. Dkt. 71, at 65:8–21. So even if Blodgett had seen these oblique references, she would have been entitled to rely on the absence of any determination from Ripp that Novak was suicidal or that special precautions were needed. *See Pulera v. Sarzant*, 966 F.3d 540, 552–53 (7th Cir. 2020) (generally nurses may rely on a doctor's medical judgment).

The word "Watch" on Novak's medication chart is even more ambiguous. Plaintiffs don't attempt to explain what that meant, but it's likely related to Ripp's clinic note to monitor the potential side effects of Novak's medication, not to monitor Novak for suicidal tendencies. In any event, the court of appeals has declined to find similar notes to be probative on whether jail staff was aware of a substantial risk of suicide, even over the objection of a dissent. *See Est. of Novack ex rel. Turbin v. Cnty. of Wood,* 226 F.3d 525, 533 (7th Cir. 2000) (Williams, J., dissenting) (arguing that there was a genuine dispute of fact on the issue of notice in a jail suicide case in part because the word "watch" was written on the inmate's medical screening form).

**Information from December 15 and later.** Plaintiffs rely on four categories of evidence from after Novak's transfer to Douglas: Novak's depression diagnosis and medication, the demographic categories that Novak belonged to, Novak's medical inquiries and grievance, and the patient-history questionnaire from January 29. This information either wouldn't provide notice of a strong likelihood of suicide or it's unreasonable to infer that Blodgett was aware of it.

The initial screening conducted by Douglas revealed that Novak had been diagnosed with depression and that he was receiving medication for it. But that's not enough to provide

notice of a substantial risk of suicide, as the court of appeals has repeatedly held. *See Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 561, 566 (7th Cir. 2021) (concluding that social worker wasn't on notice that inmate was suicidal despite knowledge that he was diagnosed with major depression and took medication for it, in part because there was "there was no objective sign . . . indicating the need for immediate intervention"); *Pulera*, 966 F.3d at 551 (rejecting argument that defendant was on notice of suicide risk because he was taking medication for depression). If that were enough, jail and prison staff would have to treat a substantial percentage of their inmates as suicide risks at all times. *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 558 (7th Cir. 2003) ("[N]ot every prisoner who shows signs of depression . . . can or should be put on suicide watch.").

Perhaps a depression diagnosis could provide notice that Novak should be referred to a specialist for further treatment. MEnD's own policy stated that an inmate should be referred to "the jail medical provider, mental health professional, or both for follow-up." Dkt. 128, ¶ 104. Blodgett didn't follow that policy, either when Novak first entered Douglas in December 2017 or when he came back from Carlton in January 2018, and defendants don't explain why. But plaintiffs don't cite any authority for the view that a mental health diagnosis triggers a duty on jail staff to provide treatment beyond medication. In fact, plaintiffs don't assert a claim in their briefs that Blodgett or any other defendant had a constitutional duty beyond responding to a known risk for suicide.

The court of appeals hasn't decided the obligations of jail staff when an inmate has a serious mental illness but isn't obviously suicidal. In *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989–90 (7th Cir. 1998), the court concluded that a jail psychiatrist didn't have notice of a substantial risk of suicide, but her knowledge of the inmate's past suicide attempts and

schizophrenia diagnosis "trigger[ed] a constitutional obligation to provide some level of care and treatment." But the court didn't say what level of care or treatment is required. In *Miller v. Harbaugh*, 698 F.3d 956, 962–63 (7th Cir. 2012), the court observed in dicta that "[m]ental illness, including suicidal ideation, comes in many degrees of severity. For those who have had only a fleeting notion that suicide might be the answer, psychiatric care is normally the responsible option to take."

*Collignon* and *Miller* provide some support for a view that the Eighth Amendment is not an all-or-nothing standard when it comes to assessing suicide risk. But *Collignon* is distinguishable because Novak had no past suicide attempts, and *Miller* didn't decide whether a psychiatric referral is required any time an inmate admits to suicidal thoughts. Even if the court assumes that it does, and that Blodgett should have referred Novak for mental health treatment, that failure wasn't a cause of Novak's death, as the court will explain § A.1.c of the opinion

Plaintiffs next point out that Blodgett received training that a person is more likely to commit suicide if he belongs to the same demographic categories as Novak: he was a white, middle-aged male with a history of drug dependency. But Novak informed Blodgett that he hadn't used drugs for a year, and plaintiffs cite no authority for the view that an inmate's age, race, or sex can provide notice of a substantial risk of suicide.

As for the medical inquiries and grievance, plaintiffs say that it's reasonable to infer that Blodgett knew that Novak "was not receiving his medication as prescribed." Dkt. 103, at 11. Blodgett denies that she knew this; she testified that she didn't have the medication records from Carlton showing that Dr. Ripp had increased Novak's bupropion prescription from 75 milligrams to 150 milligrams. Dkt. 45 (Blodgett Dep. 36:20–37:4). Her response to Novak's

grievance states that she called Carlton, and a nurse confirmed that 75 milligrams was the correct dose. Plaintiffs point to multiple reasons to question that testimony, including that Carlton usually sent Douglas copies of inmates' medical records, Carlton has no record of Blodgett calling, and Blodgett doesn't remember whether she actually called. On the other hand, Blodgett wasn't the only nurse who refused Novak's request to increase his dose, suggesting that the problem was confusion rather than a refusal to comply with a doctor's prescription.

The court will assume that Blodgett did know or at least was aware of a substantial risk that Novak should have been getting a larger dose of bupropion, but that's not enough to reasonably infer that Blodgett knew that receiving a lower dose would place Novak at risk of suicide.[4] Plaintiffs rely solely on Blodgett's answer in her deposition that "it can" to the question whether "untreated depression can lead to suicide." Dkt. 45, at 52:8-12. But that is a far cry from knowledge that getting a lower dose of bupropion could lead to suicide.

*Pulera*, 966 F.3d 540, is instructive. The plaintiff was an arrestee who repeatedly asked jail medical staff for his anxiety and depression medication over a two-day period. Medical staff had the medication, but they refused to give him any because some of the pills were missing, and they suspected he had been abusing the medication, though they didn't actually try to confirm this one way or the other. In his second request, Pulera wrote, "My heart hurts. I can't

---

[4] The parties dispute whether Novak began receiving the 150 milligrams of bupropion on January 31. Blodgett stated in her grievance response that the problem was corrected then, and Novak stopped complaining about his medication after that. But plaintiffs ask the court to infer that jail staff continued giving Novak the wrong dose because Novak's medication records from Douglas are missing. That's not a reasonable inference based on the evidence in the record, but the court will assume that Novak didn't receive the higher dose even after January 31 because drawing that inference makes no difference to the outcome of the case.

breathe. I need my meds or I can die. My heart is pounding. They are here, I need you to please bring me my meds ASAP. Thank you." In his third request, he wrote "I can't eat, sleep. I am throwing up and I am dizzy. I can't breathe. I need my blood pressure taken. Please see me. My brother and mother just died. I need my clonazepam. I am sick." Staff denied the request each time. Later that night, Pulera attempted to hang himself with a bedsheet, but officers cut him down in time to save him. *Id.* at 546–48.

Applying the standard for arrestees—which is easier for a plaintiff to meet than the subjective deliberate-indifference standard used under the Eighth Amendment—the court of appeals concluded that Pulera's claim failed. The court reasoned in part that medical staff weren't on notice that the deprivation of the inmate's medication would lead him to commit suicide, writing that it wouldn't be reasonable to infer that "depriving Pulera of his medications might be deadly from the mere fact that a physician had prescribed them to him." *Id.* at 552–53. The court also noted that there was no evidence that Pulera's medications were prescribed "because he was known to be suicidal without them." *Id.*

The same conclusion applies in this case. Plaintiffs haven't cited any evidence that Blodgett was on notice that getting the higher dose was necessary to lessen a risk of suicide. Dr. Ripp hadn't flagged Novak as a suicide risk, and he didn't communicate to Douglas staff or anyone else that Novak's medication was needed to address a suicide risk or even that the medication increase was urgent. Novak had just told Blodgett a few days earlier that he wasn't suicidal. He didn't say in any of his medical inquiries or his grievance that his depression was getting worse, and he didn't identify any other reasons why he needed the higher dose without delay. He simply wrote that he was receiving the wrong dose. Based on that information, no

reasonable jury could find that Blodgett knew of a substantial risk that Novak might harm himself without the increase.

This leaves the questionnaire on which Novak circled "yes" that he was having "thoughts of suicide or death" and experiencing other mental health symptoms. Plaintiffs again fail to cite any evidence that Blodgett ever saw this document or would have had any reason to review it. Novak prepared the document for Dr. Glick (the state psychiatrist), not for jail staff. The questionnaire did become part of Novak's medical file at Carlton, so it's reasonable to infer that it was shared with Blodgett. But plaintiffs' only evidence that Blodgett read the document is that she was working on January 29 when the document would have been sent to Douglas. Plaintiffs don't say that either Glick or Carlton staff flagged the document as important or that nurses at Douglas had a practice of personally reviewing every medical record sent from another facility. So it simply isn't reasonable to infer that Blodgett was aware of how Novak filled out the form.

Even if Blodgett had read Novak's answers on the questionnaire, it doesn't necessarily follow that she had notice of a strong likelihood that Novak was suicidal. The court of appeals has held in other cases that an acknowledgment of thoughts about suicide doesn't necessarily show knowledge of a substantial risk of a suicide attempt if the inmate denies that he is suicidal, as Novak did multiple times, including on the same questionnaire. *See Czapiewski v. Zimkiewicz*, 768 F. App'x 579, 582 (7th Cir. 2019); *Boncher*, 272 F.3d at 485–86. More generally, the court has held that jail staff may rely on an inmate's denial that he is suicidal. *See Matos*, 335 F.3d at 557 ("[W]e can at most suppose that the defendants should have known not to take 'no' for an answer when Matos told them he was not suicidal. But that inference, if it leads anywhere, leads only to negligence."); *Jump v. Vill. of Shorewood*, 42 F.4th 782, 787 (7th Cir.

2022) ("[M]ost dispositively, we have no facts that [the inmate] told [the defendants] he was suicidal.").

Plaintiffs cite no authority that undermines these cases. *Miller*, 698 F.3d at 962–63, suggests that the appropriate response when an inmate expresses suicidal thoughts but denies an intent follow through would be to refer the inmate for psychiatric care. But if Novak read the questionnaire, she also would have known that the questionnaire was for an appointment with Dr. Glick because that was stated on accompanying documents. So she could infer that Glick would address the issue.

That being said, *Czapiewski*, *Matos*, *Boncher*, and *Jump* aren't identical to this case. And it wouldn't be an unreasonable extension of *Miller* to hold that a jail nurse must do *something* if she learns that an inmate is currently having suicidal thoughts. But the court need not decide the issue.  Even if Blodgett did review the questionnaire, *and* she realized after that review that Novak was suicidal, there is a still a problem with causation, which the court will discuss in § A.1.c.

### b.  Adverse inference

Plaintiffs contend that any failure to show that Blodgett knew about Novak's suicide risk is the result of Blodgett's destruction of parts of Novak's medical file, and they ask the court to draw an adverse inference in their favor. Defendants acknowledge that some of Novak's medical records from Douglas are missing, but they deny that Blodgett destroyed any of them, and they contend that plaintiffs haven't met the standard for obtaining an adverse inference. Alternatively, they contend that an adverse inference isn't enough to create a genuine issue of material fact.

To obtain an adverse inference related to spoliation of evidence, a plaintiff must demonstrate that a defendant intentionally destroyed the evidence for the purpose of hiding adverse information. *Downing v. Abbott Lab'ys*, 48 F.4th 793 (7th Cir. 2022). To support an adverse inference in this case, plaintiffs rely on the following evidence:

- Blodgett admits that she had Novak's medical file the morning after he died.

- No one else has testified that he or she had the full medical file after Blodgett. The director of nursing, James Sweeney, reviewed medical records that Blodgett provided, but he doesn't remember seeing Novak's medication chart in those records.

- Blodgett admits that she prepared a suicide screening form after Novak died and then backdated it.

- Blodgett admits that she was the one who put the medical file in storage.

- Defendant Leonard (MEnD's owner) isn't aware of any other medical file that has gone missing.

- Records from Novak's medical records were later discovered in Blodgett's desk, and Blodgett couldn't explain why they were there or why she didn't turn them over earlier.

This is strong evidence that Blodgett destroyed Novak's missing records and that she did so to hide adverse information. The only alternative explanation offered by defendants is that Bob Galovich, the jail administrator, lost the records months later when he completed a form related to Novak's suicide for the Wisconsin Department of Corrections. Galovich answered "yes" when defense counsel asked him during his deposition whether it would be "a fair assumption that you'd have to have some sort of medical records or information available to you" to fill out the form. Dkt. 38, at 126:6–11. But Galovich also said that he doesn't remember specifically what information he had when he filled out the form, *id.* at 106:15–19, and the form itself is simply a series a checkboxes, so it's weak evidence of what records

Galovich reviewed. And Galovich checked "unknown" next to questions asking about Novak's history of medical and mental health issues, which suggests that he didn't have Novak's medical records, at least not all of them. *See* Dkt. 78-33.

The court of appeals has considered many requests for sanctions based on spoliation, but neither side cites any cases in which the court concluded that a sanction was justified. Rather, the court has consistently denied requests for sanctions based on a failure to show bad faith. *See, e.g., Perez v. Staples Cont. & Com. LLC*, 31 F.4th 560, 568–69 (7th Cir. 2022); *Bracey v. Grondin,* 712 F.3d 1012, 1019–20 (7th Cir. 2013); *Norman–Nunnery v. Madison Area Technical College*, 625 F.3d 422, 428–29 (7th Cir. 2010); *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644–45 (7th Cir. 2008). So the court of appeals hasn't had an opportunity to set forth guidelines on imposing a sanction. For example, the parties don't cite any cases in which the court considered whether a hearing is required before finding bad faith or how to determine what an appropriate adverse inference is.

Even if a hearing would ordinarily be required, the court concludes that a hearing isn't necessary in this case. Even if the court assumes that Blodgett acted in bad faith for the purpose of hiding adverse information, the court isn't persuaded that plaintiffs can prove their Eighth Amendment claim against Blodgett, even with the benefit of an appropriate adverse inference.

Determining an appropriate sanction is within the discretion of the district court. *Flagg v. City of Detroit*, 715 F.3d 165, 178 (6th Cir. 2013). In this case, making that determination requires consideration of what records are likely to be missing and what they could reasonably show. Plaintiffs identify three types of documents that may be missing: (1) the health assessments and screenings from Novak's bookings at Douglas in December 2017 and January

24

2018; (2) Novak's records from Carlton; and (3) medication records showing what bupropion dose Novak received from January 27 to February 5, 2018.

The second category of documents isn't missing. The parties agree that all of Novak's records from Carlton were preserved by Carlton, and the court has already assumed that Blodgett reviewed those documents. Similarly, the court has assumed that Novak's medication records would show that he didn't receive the 75-milligram increase to his bupropion medication, even after Blodgett wrote in response to Novak's grievance that the change was approved. So no additional inferences are warranted regarding those documents.

This leaves the health assessments and screenings. It's undisputed that Blodgett did conduct a health assessment on January 26 and that Novak denied suicidal ideation at the time. Blodgett says that she also conducted a suicide screening on January 26 showing that Novak wasn't a suicide risk, but she admits that she didn't prepare the form until after Novak died.[5] The following records that should have been prepared are missing: (1) a health assessment from Novak's December 2017 booking; (2) a suicide screening from Novak's December 2017 booking; and (3) a "beck depression inventory" and a depression/anxiety form from Novak's December 2017 and January 2018 bookings. In her deposition, Novak says that she doesn't recall preparing the missing documents. Dkt. 45, at 116:18–117:3.

Plaintiffs say that either one of two adverse inferences would be appropriate. First, they say that it's reasonable to infer that Blodgett simply didn't prepare the missing documents or the screenings that should have accompanied them. That's a reasonable inference, and probably the most likely. It's consistent with Blodgett's attempt to prepare the suicide screening form

---

[5] Plaintiffs dispute the accuracy of the backdated suicide screening form, and the court hasn't considered that form for any purpose other than as evidence of Blodgett's bad faith.

after the fact and to hide her failure to follow MEnD policy. But drawing that inference wouldn't help plaintiffs because it would confirm that Blodgett was simply ignorant of any information indicating that Novak was suicidal. Even if that ignorance was a result of Blodgett's own negligence, that wouldn't be enough to support an Eighth Amendment claim.

Alternatively, plaintiffs say that that it would be reasonable to infer that Blodgett *did* perform all the required assessments and screenings, but those revealed mental health issues similar to what Novak disclosed on the patient questionnaire, so Blodgett destroyed the records to hide the fact that she failed to take any action. This inference is less plausible than the first, as it suggests that Blodgett was concerned enough about Novak to conduct multiple, thorough screenings, but then decided both times to simply ignore the information, even though referring Novak to another medical provider for further evaluation as required by policy wouldn't have required significant additional effort on her part.

Regardless, even if the court assumes that Blodgett did conduct more thorough health screenings and that those screenings uncovered information similar to Novak's answers on the patient questionnaire, that wouldn't be enough to defeat defendants' motion for summary judgment on plaintiffs' claim against Blodgett. As already noted, plaintiffs don't cite any authority regarding jail staff's obligations when an inmate discloses that he is seriously depressed and has suicidal thoughts but is denying any plan or intent to harm himself. But even if the court assumes that Blodgett did have notice of a serious risk of suicide, plaintiffs' claim fails on the element of causation, which the court will discuss next.

### c.  Causation

Every claim filed under 42 U.S.C. § 1983 includes the element of causation, which has two components: cause-in-fact and proximate cause. *Whitlock v. Brueggemann*, 682 F.3d 567,

582–83 (7th Cir. 2012). Cause-in-fact means that "the injury would not have occurred absent the conduct," and proximate cause means that "the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Id.*

In this case, plaintiffs contend that Blodgett caused Novak's suicide by failing to do three things: (1) refer Novak to a more qualified medical professional; (2) place him on suicide watch; and (3) give him the correct dose of bupropion. Dkt. 103, at 13–15. Plaintiffs haven't adduced evidence from which a reasonable jury could find that these alleged failures were both cause-in-fact and the proximate cause of Novak's suicide, so the court will grant summary judgment to Blodgett.

**Referral for further evaluation.** Plaintiffs first say that Blodgett should have referred Novak to another healthcare provider for further evaluation when he first entered the jail in December 2017 or when he reentered the jail in January 2018 after a short stay in Carlton. But plaintiffs don't explain how a referral would have led to a different result. Novak's mental health *was* evaluated—twice—between December 2017 and his suicide, first by Dr. Ripp in January 2018 and then by Dr. Glick in February 2018.

In January 2018, Novak asked to see Ripp, a physician, about his medication for depression. During that examination, Ripp observed both positive and negative signs about Novak's mental health. On one hand, Novak reported that his depression medications "have helped," that he was "sleeping well," and that he had a good appetite. *Id.* On the other hand, Novak was quiet, made poor eye contact, and appeared depressed during the appointment. *Id.* Based on his examination, Ripp determined that Novak wasn't suicidal. Ripp increased Novak's bupropion prescription, but he didn't give jail staff any instructions for special precautions to take with Novak.

On February 5, Glick interviewed Novak for an hour and a half as part of a mental health assessment. Glick reviewed the questionnaire in which Novak indicated that he was suffering from a variety of mental health symptoms, including thoughts of suicide or death and depression. Despite Novak's answers on the questionnaire, he denied suicidal thoughts during the interview, and Glick determined that Novak wasn't suicidal. Glick increased Novak's bupropion prescription, but, like Ripp, Glick didn't instruct jail staff that Novak was a suicide risk or that he needed special monitoring.

Novak took his own life only a few hours after he returned from his evaluation with Glick. In their brief, plaintiffs don't challenge the adequacy of either Ripp or Glick's evaluation, and they don't explain why a different mental-health professional would have reached a different conclusion from Ripp and Glick.[6]  Plaintiffs also don't identify any suspicious behavior that occurred during the few hours between Novak's appointment with Glick and his suicide that would have alerted jail staff that Novak had an urgent need for mental health treatment. (In fact, Blodgett wasn't working at the jail that evening, so she wouldn't have been aware of that behavior anyway.) Under these circumstances, no reasonable jury could find that a mental health referral from Blodgett would have prevented Novak's suicide. *See Moriarty v. Cnty. of San Diego*, No. 17CV1154-LAB (AGS), 2019 WL 1282002, at *4–5 (S.D. Cal. Mar.

---

[6] Plaintiffs' psychiatric expert, Ronald Groat, criticizes Glick's report because it doesn't say whether he "investigated Novak's previous answer that he was experiencing thoughts of death and suicide" on the patient questionnaire. Dkt. 108, at 4. Plaintiffs don't raise this issue in their brief, so they forfeited it. In any event, Glick explained in his deposition that he *did* question Novak about his questionnaire answers, including his admission of suicidal thoughts, but Glick was still satisfied after the interview that Novak wasn't suicidal. Dkt. 74, at 120:10–124:8. In his own deposition, Groat says that he isn't "criticizing [Glick's] conclusion," and that Glick "appeared to meet all standards from a professional perspective." Dkt. 122, at 209:10–210:4.

20, 2019) (concluding that defendants' failure to refer inmate for mental health treatment didn't cause his suicide because "[a]ny failure to have him evaluated . . . was corrected when, in the six days following his arrest, he was evaluated twice by a psychiatrist and once by a nurse").

Plaintiffs challenge defendants' reliance on Glick, but none of plaintiffs' arguments are persuasive. First, plaintiffs say that Glick's report is irrelevant because Blodgett didn't rely on it, and they cite *Sanville v. McCaughtry*, 266 F.3d 724 (7th Cir. 2001), in support. But the issue in *Sanville* was whether correctional officers acted reasonably by failing to check on an inmate for approximately five hours after he told them he was suicidal. The officers contended that they couldn't be held liable because they relied on a doctor's determination that the inmate was not a suicide risk. The court rejected the argument because there was "no evidence indicating that any of the doctors actually determined that Matt was not suicidal, much less that they then informed the guards that Matt was not suicidal and that the guards then decided not to act based on that information." *Id.* at 739. *Sanville* isn't instructive because defendants aren't relying on Ripp and Glick's evaluations to show that Blodgett acted reasonably but rather to show that Blodgett didn't cause Novak harm, an issue that *Sanville* didn't address.

Second, plaintiffs say that Glick didn't have access to Novak's jail records, so his opinion wasn't fully informed. This objection wouldn't apply to Ripp, and it's not persuasive for Glick. Glick's report shows that he knew Novak's long history of depression, his family history, his legal history, his history of addiction to methamphetamines, his medications, and the symptoms that he was reporting. Dkt. 78-28. Plaintiffs don't identify any important information in the jail records that wasn't covered by the information that Glick already had.

Third, plaintiffs say that Glick's evaluation of Novak wasn't ordered by Douglas or MEnD, and the purpose of the evaluation wasn't "to determine conditions of confinement." Dkt. 103, at 27. Plaintiffs don't clearly explain what they mean by that, but the court understands plaintiffs to contend that Glick's report isn't helpful because his job wasn't to determine whether Novak should be placed on suicide watch or monitored more closely. That's correct, but plaintiffs don't explain why that matters. Glick's job *was* to evaluate Novak's mental health, including whether he was suicidal. And it wouldn't be appropriate to place Novak on suicide watch unless it was determined by someone that Novak was in fact suicidal. Plaintiffs' argument would be persuasive if Glick had made such a determination and then jail staff declined to do anything simply because Glick didn't identify precautions in his report.[7] But that's not what happened.

The importance of Glick's report is that it's powerful evidence that a better screening or a mental health referral by Blodgett wouldn't have revealed Novak to be a high suicide risk. In this context, it doesn't matter whether Glick was supposed to recommend suicide precautions in the event that he determined that Novak was suicidal because Glick *didn't* determine that Novak was suicidal. So the court concludes that Blodgett's failure to refer Novak for a mental health evaluation wasn't a cause-in-fact of his suicide.

**Placement on suicide watch.** The next alleged failing by Blodgett is that she didn't place Novak on suicide watch. It's reasonable to infer that Novak's suicide could have been prevented if Novak had been on suicide watch on February 5 because he could have been

---

[7] In fact, Glick testified that he would have notified jail staff and recommended special precautions, including monitoring or hospitalization, if he had determined that Novak was suicidal. Dkt. 74, at 29:6–33:8.

monitored more closely and items that he could have used to harm himself could have been taken away from him, including bedsheets. But as already noted, plaintiffs haven't identified anything that happened on February 5 that would have suggested to Blodgett or any other staff that Novak needed closer monitoring. Rather, plaintiffs' contention is that Blodgett should have flagged Novak as a suicide risk on December 15, 2017, or January 26, 2018, when he was entering the jail.

But both the record and case law show that suicide watch isn't a long-term measure to be imposed indefinitely. One example is illustrated in *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525 (7th Cir. 2000), which bears similarities to this case beyond the decedents' last names. When Shannon Novack entered the Wood County jail, he had never attempted suicide before, but jail staff knew that he had just come from a mental health facility and was at risk for suicide. They placed him in an observation cell, but they released him one day later because he denied that he was suicidal, and he exhibited no suicidal behavior while in observation. Novack also had a psychiatrist who was prescribing him medications but didn't identify him as a suicide risk. Two weeks later, Novack killed himself at the jail, and his family sued the county and jail staff. The court affirmed summary judgment for the defendants, concluding that they weren't required to keep the inmate in observation for longer than a day when he wasn't doing or saying anything that suggested he was suicidal. *Id.* at 530. By contrast, in *Cavalieri*, 321 F.3d at 619, the court of appeals did criticize staff for failing to place an inmate on suicide watch, but it was because the inmate was "on the verge of committing suicide," and he attempted suicide the same say he was arrested.

*Novack* and *Cavalieri* are about knowledge of a risk of harm, not causation, but they demonstrate that suicide watch is a short-term measure for inmates who are actively suicidal,

not an indefinite classification for inmates suffering from depression. More directly on point is *Minix*, 597 F.3d at 832–33, in which the court concluded that there was an insufficient causal link between an inmate's suicide in April 2003 and an alleged failure to place him on suicide watch in March 2003 because there were too many intervening events in between.

The policy in place at Douglas for placement and retention on suicide watch is consistent with the standards endorsed in these cases. Specifically, when an inmate was placed on suicide precautions, he would be reassessed daily by Leslie Walker, a licensed professional counselor employed by Douglas County. Dkt. 127, ¶ 160. Walker would not authorize suicide precautions longer than necessary, and it was usually no more than a day or two. Dkt. 72 (Walker Dep. 86:23–87:24). Placements on suicide watch of a week or more were typically reserved for those who made a suicide attempt. *Id.* at 87:9–88:3.

Plaintiffs' position is essentially that Novak should have been on suicide precautions for the entire time he was in custody at Douglas. But plaintiffs don't cite any evidence of behavior that would have justified that approach or any case law suggesting that long-term placements on suicide watch are appropriate under the circumstances of this case. So even if Blodgett should have placed Novak on suicide watch on December 15 or January 26, it isn't reasonable to infer that he would have stayed on suicide watch until February 5. Blodgett simply wasn't aware of any behavior by Novak that would have justified such a lengthy placement. So plaintiffs have failed to show a causal connection on this issue too.

**Proper medication dose.** Plaintiffs have also failed to adduce evidence that Blodgett's failure to authorize the increase in Novak's bupropion prescription was a cause-in-fact of his death. To support causation, plaintiffs rely on the opinion of Ronald Groat, a psychiatrist, who wrote, "It is my opinion that not receiving his depression medication as prescribed in the days

leading up to his suicide substantially contributed to his declining mental health and ultimately his suicide on February 5, 2018." Dkt. 108, at 3. But Groat doesn't provide any basis for an opinion that the difference between a 150-milligram dose and a 75-milligram dose contributed to Novak's suicide or even reasonably could contribute to a suicide. For example, he doesn't say that bupropion can decrease suicidal thoughts or impulses or is otherwise associated with preventing suicide. It is well established that experts must provide more than just a bare conclusion. *See, e.g., Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."); *Zamecnik v. Indian Prairie School Dist. No. 204*, 636 F.3d 874, 881 (7th Cir. 2011) ("Mere conclusions, without a hint of an inferential process, are useless to the court.").

In his deposition, Groat explained that his opinion was based on his belief that Novak "apparently felt better at the higher dose." Dkt. 122, at 171:3–16. Groat cites Novak's medical inquiries and grievance as the basis for that belief, but those records say nothing about Novak feeling better or worse. Novak wrote only that he was getting the wrong dose, without alleging any symptoms. So Groat's opinion is based only on speculation, and an opinion based on speculation isn't admissible. *See Walker v. Peters*, 233 F.3d 494, 502 (7th Cir. 2000). Without Groat's opinion, "[t]he record contains no evidence from which a factfinder could infer that, had [Novak] received his medications, he would not have attempted suicide. . . . A jury could not infer that depriving [Novak] of his medications might be deadly from the mere fact that a physician had prescribed them to him." *Pulera*, 966 F.3d at 550–52.

Plaintiffs also raise two more general arguments against dismissing the claim against Blodgett for lack of causation. First, plaintiffs cite *Estate of Swayzer v. Milwaukee County*, No. 16-

CV-1703-BHL, 2022 WL 656884, at *10 (E.D. Wis. Mar. 4, 2022), for the proposition that they don't have to prove that Blodgett caused Novak's death, only that her actions led to some harm. But this argument fails because plaintiffs don't point to any evidence of harm other than Novak's suicide.

Second, plaintiffs cite *Gayton v. McCoy*, 593 F.3d 620 (7th Cir. 2010), for the proposition that summary judgment should be granted for lack of causation only in rare instances. But this is such an instance. It is certainly rare for a psychiatrist unaffiliated with jail officials to determine only hours before an inmate's death that he isn't suicidal. Plaintiffs haven't persuasively explained how Blodgett can be held liable in that situation, and they haven't cited admissible evidence that Novak's medication dose caused him any harm. When evidence has been similarly lacking, the court of appeals hasn't hesitated to grant summary judgment on causation in § 1983 cases. *See, e.g.*, *Pulera*, 966 F.3d at 552–53 (granting summary in inmate self-harm case on element of causation); *Belbachir*, 726 F.3d at 983–84 (granting summary judgment in jail suicide case because "a causal relation between fault and injury is missing"); *Walker*, 233 F.3d at 502 (granting summary judgment on causation in Eighth Amendment medical-care claim after concluding that expert's opinion wasn't admissible).

A reasonable jury could find that Blodgett made many mistakes in how she treated Novak and even that she intentionally hid or destroyed documents to hide her mistakes. These are serious issues that call into question Blodgett's competence and ethics. But the Eighth Amendment sets a "high hurdle" for liability. *Minix*, 597 F.3d at 835. Despite the evidence of Blodgett's errors and misconduct, no reasonable jury could find that she knew Novak was suicidal at the time he died or, even if she did, that his suicide could have been prevented if

only she had taken reasonable steps to help him. Under these circumstances, the court must grant summary judgment to Blodgett on plaintiffs' Eighth Amendment claim against her.

### 2. Todd Leonard

Leonard is the owner of MEnD and its chief medical officer. The parties agree that Leonard had no contact with Novak and was unaware of his situation at Douglas. But plaintiffs contend that Leonard can be held liable for his role as Blodgett's supervisor.

A supervisor can't be held liable under § 1983 simply because he negligently failed to supervise an employee. *See Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011) ("Section 1983 does not authorize 'supervisory liability.'"). Rather, the plaintiff must show that the supervisor knew about constitutional violations and could have stopped them but instead allowed them to continue. *Kemp v. Fulton Cnty.*, 27 F.4th 491, 498 (7th Cir. 2022). The court is dismissing the Eighth Amendment claim against Blodgett, and plaintiffs don't identify any other MEnD employees who violated Novak's rights, so plaintiffs' claim necessarily fails against Leonard as well.

## B. Municipal liability under the Eighth Amendment

Plaintiffs assert Eighth Amendment claims against both MEnD and Douglas County. The same standard governs claims against corporate contractors like MEnD and municipalities like the county. *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017). Specifically, the plaintiff must show three things: (1) action or inaction by the defendant that can be fairly described as the defendant's policy; (2) notice to the defendant that its conduct would lead to constitutional violations; and (3) a direct causal connection between the defendant's policy and the constitutional injury. *Lapre v. City of Chicago,* 911 F.3d 424, 430–31 (7th Cir. 2018).

### 1. MEnD

Plaintiffs don't challenge MEnD's official policies on suicide prevention. Rather, plaintiffs say that MEnD was failing to enforce and implement those policies. Specifically, plaintiffs contend that a policy may be inferred from MEnD's "widespread custom and practice of intentionally understaffing its jail clinics by providing no meaningful physician or medical provider oversight or supervision to the nurses left to care for inmate's serious medical needs, including screening inmates for risk of suicide and determining appropriate conditions of confinement." Dkt. 103, at 36.[8] The court understands plaintiffs to be saying that lack of adequate staffing and supervision led to inadequate suicide screenings and precautions for inmates because nurses like Blodgett were stretched too thin and no one was around to make sure that policies were followed. In support of such a custom or practice, plaintiffs point to evidence that Crystal Waagmeester—the medical director whom MEnD assigned to Douglas— was a physician assistant who visited Douglas only once a week for about an hour; Waagmeester never evaluated Novak; she signed off on inmate health assessments that were obviously incomplete, including Novak's health assessments; and in 2016 and 2017, there were at least five other inmates at jails that MEnD serviced (not Douglas) who committed suicide after not being properly screened by MEnD staff, but MEnD didn't discipline any of the staff involved or change any of its policies in response.

---

[8] Plaintiffs challenged other alleged MEnD policies in their complaint, *see* Dkt. 61, ¶ 248, but plaintiffs didn't respond to defendants' arguments regarding those alleged policies, so plaintiffs forfeited any arguments based on the other policies.

The evidence cited by plaintiffs raises serious questions about why some inmates at MEnD facilities aren't being screened in accordance with MEnD's own policies. But concerning facts alone aren't enough to impose corporate liability.

A corporate defendant's inaction such as a failure to supervise or hire staff can qualify as a policy for the purpose of establishing liability under § 1983. *See Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927–28 (7th Cir. 2004). "But the path to . . . liability based on inaction is steeper because. . . a failure to do something could be inadvertent and the connection between inaction and a resulting injury is more tenuous." *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 378 (7th Cir. 2020). So when the alleged policy is based on inaction as in this case, the plaintiff must show either that high-ranking officials knew that constitutional violations were likely to occur because of the defendant's inaction or that such a risk was obvious. *Id.* at 379–80.

In this case, plaintiffs' claim against MEnD has problems with both the notice and causation elements of the claim. As for the staffing issue, plaintiffs don't cite any evidence connecting Blodgett's failure to screen Novak with an understaffing problem. For example, plaintiffs don't say that Blodgett was unable to screen Novak because she was overworked or had too many other things to do, and they don't say that Waagermeester didn't have time to evaluate Novak. So regardless of whether MEnD should have more medical staff at Douglas, understaffing can't be a basis for holding MEnD liable in this case.

As for the failure to supervise, there's a stronger argument that more monitoring by Waagermeester or Leonard could have helped ensure that Blodgett followed suicide prevention policies. But plaintiffs don't point to any evidence putting MEnD on notice that Blodgett or other nurses at Douglas weren't following those policies. Plaintiffs cite instances of employees

at *other* jails serviced by MEnD who failed to properly screen inmates who later committed suicide. But those jails involved different employees. Plaintiffs don't cite any other instances in which an employee at Douglas failed to follow suicide prevention policies, and they don't cite any cases in which courts have held that problems with different employees at different jails could provide a municipality or corporate contractor notice of a constitutional violation.

There may be situations in which problems at other facilities provide obvious notice of a larger problem that is common to all the facilities that a company operates. But even if the court assumes that this is such a case, plaintiffs' claim against MEnD fails for a similar reason as their claim against Blodgett, which is that they have haven't shown a direct causal connection between Blodgett's failure to follow MEnD policies and Novak's suicide. If Blodgett had followed MEnD policies, she would have referred Novak to Waagermeester (a physician's assistant) or Walker (a licensed professional counselor). Instead, Novak was evaluated by a physician and a psychiatrist, who both determined that Novak wasn't suicidal. In light of those assessments, it isn't reasonable to infer that there is a direct causal connection between Novak's suicide and any failure by MEnD to ensure that its employees at Douglas were properly applying its suicide prevention policies. And without such a connection, MEnD can't be held liable. *See Pulera,* 966 F.3d at 55, (dismissing for lack of causation claim against municipality for failing to prevent inmate's attempted suicide); *Lapre*, 911 F.3d at 433–34 (same); *Boncher*, 272 F.3d at 488 (same).

Plaintiffs rely on two cases from Minnesota in which the district court denied summary judgment on constitutional claims against MEnD for failing to prevent an inmate suicide at a Minnesota county jail. *See Brenner v. Asfeld,* No. 18-CV-2383 (NEB/ECW) (D. Minn. Mar. 31, 2022); *Lynas as Tr. for Lynas v. Stang,* No. 18-2301 (JRT-KMM), 2020 WL 4816375 (D. Minn.

38

Aug. 19, 2020). Plaintiffs cite the holdings of these cases, but they don't discuss the facts, and a quick of review of the cases shows why. In both cases, the inmate killed himself within a few days of first being booked at the jail, and in both cases, the inmate didn't see a physician or psychiatrist. So neither case presented the problems with causation that this case does, and neither case is instructive.

The court will grant summary judgment to MEnD on plaintiffs' Eighth Amendment claims.

### 2. Douglas County

Plaintiffs don't contend that Douglas County or any of its employees were aware that Novak was suicidal. Instead, plaintiffs assert two other theories of municipal liability against the county. First, plaintiffs say that the county can be held liable for MEnD's constitutional violations because the county "acquiesced to MEnD's custom and practice of providing no meaningful physician or medical provider oversight and supervision." Dkt. 100, at 6. Regardless of whether "acquiescence" is viable theory of municipal liability as a general matter, this claim fails because the court has concluded that MEnD can't be held liable under the Eighth Amendment.

Second, plaintiffs say that the county had a widespread practice of failing to follow its policy on conducting wellbeing checks. The official policy requires jail staff to "make personal observation of each inmate at frequent and irregular intervals not to exceed every [h]alf hour." Dkt. 120, ¶ 46. But plaintiffs say that the county's actual *practice* was to allow officers to "disregard the requirement that intervals between wellbeing checks not exceed thirty minutes so long as two checks were performed each hour." Dkt. 100, at 13. Plaintiffs' legal theory is that performing anything less than checks every 30 minutes violates the Eighth Amendment

because "the risk of suicide becomes obvious after thirty minutes of no personal observation," Dkt. 100, at 20, even for inmates like Novak who aren't on suicide watch.

Plaintiffs rely on vague testimony of McIlvain to establish the existence of the alleged practice. *See* Dkt. 91, at 81:18-21 and 101:25-102:8. But even if the court assumes that the county had a policy of checking on inmates twice an hour rather than every 30 minutes, plaintiffs' claim fails because the court of appeals has already held that hourly checks are sufficient to comply with the Eighth Amendment, even for inmates who *are* flagged as possible suicide risks. *See Est. of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996).

Plaintiffs say that *Cole* is distinguishable because there was a nearly 90-minute gap between checks on Novak the night he died. Plaintiffs don't cite any authority suggesting that the difference between one hour and 90 minutes has constitutional significance. In fact, the only authority they cite is *Wells v. Bureau Cnty.*, 723 F. Supp. 2d 1061, 1083 (C.D. Ill. 2010), in which the court said that an official policy of leaving inmates in general population unobserved for *eight hours* could violate the Eighth Amendment because of the general risk that inmates could harm themselves in that amount of time. In any event, plaintiffs don't contend that the county had a policy of waiting 90 minutes between checks, so that's not a basis for municipal liability.

Plaintiffs attempt to get around this problem by saying that that the county's "practice was to disregard the personal observation requirement if an inmate covered the cell window with toilet paper" and that McIlvain followed that practice on February 5 when he waited almost a half hour after seeing toilet paper on Novak's cell window before going back to check on him.  Dkt. 100, at 13. Plaintiffs again rely on McIlvain's testimony, but that testimony isn't helpful for two reasons. First, McIlvain said that in his experience inmates put toilet paper on

their window when they were using the toilet, so officers "would give them a reasonable amount of time to finish" and then go back to check on the inmate. Dkt, 91, at 85:6–8 and 86:2–8. He didn't say that there was a widespread practice of simply skipping the inmate's cell and waiting until the next round of checks to confirm his wellbeing. Second, McIlvain admitted that he didn't know whether higher-ranking officers were aware that he or any other officer wasn't conducting wellbeing checks on inmates when their windows were covered. *Id.* at 103:87–15. He "assumed" that they were aware, but he provided no foundation for that assumption, so that testimony has no evidentiary value. *See* Fed. R. Evid. 602.

So the claim against the county fails for multiple reasons: (1) plaintiffs haven't adduced evidence that the county had a policy of allowing officers to go 90 minutes without checking on inmates in general population; and (2) even if they did have such a policy, plaintiffs cite no authority suggesting that the policy would be unconstitutional. The court will grant summary judgment to the county on plaintiffs' Eighth Amendment claims.

## C.  State-law claims

Plaintiffs assert negligence claims against Leonard and MEnD and wrongful death claims against McIlvain and the county. They rely solely on 28 U.S.C. § 1367, the supplemental jurisdiction statute, as the basis for subject matter jurisdiction over their state-law claims. *See* Dkt. 61, ¶ 16.

"Absent unusual circumstances, district courts relinquish supplemental jurisdiction over pendent state law claims if all claims within the court's original jurisdiction have been resolved before trial." *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 352 (7th Cir. 2019). The court is dismissing all of plaintiffs' federal claims in this case, and both sets of defendants ask the court to relinquish jurisdiction over the state-law claims if the federal claims are dismissed. Dkt. 77,

at 42 and Dkt. 86, at 39. Plaintiffs don't object to that request or identify any reason why it would be appropriate to retain jurisdiction. So the court will dismiss the state-law claims without prejudice to plaintiffs refiling them in state court.

CONCLUSION

Looking at the evidence in this case, it is easy to find much to criticize about the defendants' treatment of Novak. It is also understandable why plaintiffs would look at that evidence and conclude that defendants failed their husband and father by failing to do more to help him. Unfortunately for plaintiffs, these failures aren't enough to prevail under the Eighth Amendment.

Nothing in the court's opinion should be interpreted to mean that the defendants acted reasonably or even that they acted unreasonably but in good faith. Plaintiffs' Eighth Amendment claims fail, not because defendants have made a persuasive case that they did everything they could to help Novak—they clearly did not—but because many of the telltale signs of potential suicide were missing. As the court of appeals recently observed, "[m]ental health is notoriously difficult to assess and treat," *Quinn*, 8 F.4th at 569, a fact confirmed by two doctors who evaluated Novak's mental health but failed to foresee the tragic outcome that prompted this lawsuit.

The evidence shows that defendants wouldn't have prevented Novak's death even if they had screened Novak appropriately and taken extra precautions when he first entered the Douglas County jail. That conclusion "in no way minimizes [plaintiffs'] personal loss," *id.*, but it requires dismissal of their claims under the Eighth Amendment.

ORDER

IT IS ORDERED that:

1. Defendants' motions for summary judgment, Dkt. 76 and Dkt. 82, are GRANTED on plaintiffs' federal claims. Plaintiffs' state-law claims are DISMISSED without prejudice to plaintiffs' refiling them in state court.

2. The clerk of court is directed to enter judgment and close this case.

Entered October 13, 2022.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge